# EXHIBIT B



**COPY**

1    Christopher M. Goodman
2    LAW OFFICE OF CHRISTOPHER GOODMAN PLC
     45 W. Jefferson St., Suite 512                          NOV 0 1 2017
3    Phoenix, AZ 85003                                       MICHAEL K. JEANES, CLERK
     (602) 253-1000                                          V. CANISALES
4    chris@goodmanlegal.com                                  DEPUTY CLERK
5    *Attorney for Plaintiffs Apex Medical Staffing LLC and*
     *Thomas Harmon*
6

7

8              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                  IN AND FOR THE COUNTY OF MARICOPA

10

11   THOMAS HARMON, an individual; and     NO.    CV 2017-014286
     APEX MEDICAL STAFFING LLC, a
12   California limited liability company,

13              Plaintiffs,                        **CERTIFICATE OF COMPULSORY**
                                                          **ARBITRATION**
14        vs.

15   GAVIN HAYS and JANE DOE HAYS,
     a married couple; SPRINGBOARD,
16   INC., an Arizona corporation; and
     various unknown and/or fictional
17   individuals and entities,

18              Defendants.

19

20

21        Undersigned counsel certifies that this case is NOT subject to compulsory arbitration

22   because the amount in controversy exceeds local limits, as provided by Rules 72-76,

23   Arizona Rules of Civil Procedure.

24

25

26

27

28

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1    DATED this 1st day of November, 2017.

2

3                              LAW OFFICE OF CHRISTOPHER GOODMAN PLC

4

5                              By

6                                 Christopher M. Goodman
                                  45 W. Jefferson St., Suite 512
7                                 Phoenix, Arizona 85003
                                  Attorney for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

2



1  Christopher M. Goodman
2  LAW OFFICE OF CHRISTOPHER GOODMAN PLC
   45 W. Jefferson St., Suite 512
3  Phoenix, AZ 85003
   (602) 253-1000
4  chris@goodmanlegal.com
5  Attorney for Plaintiffs Apex Medical
   Staffing LLC and Thomas Harmon
6



NOV 0 1 2017

MICHAEL K. JEANES, CLERK
V. CANISALES
DEPUTY CLERK

7

8         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9              IN AND FOR THE COUNTY OF MARICOPA

10

11  THOMAS HARMON, an individual; and          NO.   CV 2017-014286
    APEX MEDICAL STAFFING LLC, a
12  California limited liability company,

13                    Plaintiffs,                     **COMPLAINT**

14        vs.

15  GAVIN HAYS and JANE DOE HAYS,
    a married couple; SPRINGBOARD,
16  INC., an Arizona corporation; and
    various unknown and/or fictional
17  individuals and entities,

18                    Defendants.

19

20

21                      **SUMMARY OF ACTION**

22

23        This case is about a large healthcare staffing company and its CEO's scheme to

24  entice a smaller staffing company and its founder into handing over its extremely valuable

25  market share based upon false and ultimately unfulfilled promises of stock, profit sharing,

26  and continued employment.   Springboard, Inc. and CEO Gavin Hays must be held

27  accountable for their multiple breaches of the agreements they proposed, drafted, attempted

28  to unilaterally change, and ultimately disregarded. Under the plain language of these

1   agreements, Plaintiffs are entitled to a significant share of Springboard stock and the profits

2   derived therefrom. Hays must also be held to account for his fraudulent statements, as well

3   as the continued devaluation of Plaintiffs' Springboard stock via the transfer of valuable

4   intellectual property and rights from Springboard to a separate entity held entirely by Hays.

5   Springboard and Hays made a deal with Plaintiffs, obtained Plaintiffs' market share,

6   obtained Plantiffs' profits, and obtained Plaintiffs' services—now Springboard and Hays

7   must fulfill their end of the bargain.

## COMPLAINT

For their Complaint, Plaintiffs Thomas Harmon ("Harmon") and Apex Medical Staffing LLC ("Apex") allege against Defendants Gavin Hays ("Hays") and Springboard, Inc. ("Springboard") as follows:

1. Harmon is an Arizona resident and resides within Maricopa County, Arizona.

2. Apex is a California Limited Liability Company.

3. Hays is an Arizona resident and resides within Maricopa County, Arizona.

4. Springboard is an Arizona corporation and has its principal place of business located within Maricopa County, Arizona.

5. The May 27, 2014 Services Agreement (hereinafter "Services Agreement") at the heart of this dispute includes a choice of law, jurisdiction, and venue provision that makes Maricopa County-based state or Federal courts the sole and exclusive jurisdiction for any dispute:

> This Agreement will be construed and governed by the laws of the State of Arizona. The parties agree that the state and federal courts in Maricopa County, Arizona have exclusive jurisdiction and are the sole venue for any litigation between the parties arising out of or relating to this Agreement.

(Exhibit 1, Services Agreement, at Section 20.)

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

2

6. The other contracts and letter agreements at the heart of this dispute also have choice of law provisions that they should be interpreted under the laws of the State of Arizona.

7. The events giving rise to this Complaint occurred largely within Maricopa County, Arizona.

8. This Court has jurisdiction over this dispute pursuant to the subject agreements as well as Article VI, Section 14 of the Arizona Constitution and A.R.S. §§ 12-123(1) & (3).

9. Venue is proper in Maricopa County Superior Court under both the terms of the subject agreements as well as A.R.S. § 12-401.

10. The choice of law provisions in the subject agreements all direct Arizona law to apply to the interpretation and adjudication of the agreements.

11. The Services Agreement, at the heart of this dispute, directs the parties to mediate any dispute prior to litigation in the Superior Court: "Before any litigation, the parties agree to first mediate all disputes within forty-five days of either party requesting mediation, in Phoenix, Arizona..." (Exhibit 1, at Section 20.)

12. Plaintiffs submitted a demand for mediation to Defendants, but a mediation was not held. Defendants waived the mediation requirement.

## GENERAL FACTUAL ALLEGATIONS

### *Harmon Builds Apex into a Successful Staffing Company*

13. Plaintiff Tom Harmon ("Harmon") received his MBA from Harvard Business School in 2010.

14. After graduating from Harvard, Harmon worked hard to identify small business

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

3

acquisition opportunities.

15. In 2010, Harmon identified a healthcare staffing company servicing the cardiovascular nursing needs of several Southern California counties, Apex Staffing.

16. Using his savings, an inheritance from his mother's untimely passing, and all other funds available to him personally, as well as funds from several investors, Harmon formed Apex Medical Staffing LLC ("Apex") for the specific purpose of acquiring Apex Staffing.

17. Harmon is the Manager of Apex.

18. On January 10, 2011, Apex completed the acquisition of the assets and existing business of Apex Staffing.

19. Harmon worked diligently, using his experience and expertise, to build Apex into a successful staffing company in Southern California.

20. In 2013, Apex was approached by Westways Staffing LLC ("Westways") to become a Westways franchisee.

21. Working with Westways provided Apex the opportunity to grow its Southern California market share.

22. Working with Westways also provided Apex the opportunity to work with other franchisees, including Joe Giron ("Giron") and his company Mission Medical Services, Inc. ("Mission").

23. Apex and Mission, working together, were able to dominate the Southern California market for cardiovascular nursing staffing services.

24. Larger, national healthcare staffing companies such as Springboard were unable to

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

enter the Southern California market for these services.

*Harmon and Apex Look Beyond the Southern California Market.*

25. With Apex's success in Southern California, Apex and Harmon had aspirations beyond the Southern California market.

26. Similarly, Giron and Mission also wanted to move beyond the Southern California market.

27. At the time, Giron was also developing a revolutionary cardiac nursing training tool that he wanted to sell to hospitals nationwide.

28. Springboard is a national healthcare staffing company headquartered in Phoenix, Arizona.

29. Hays is the CEO of Springboard.

30. In early 2014, Hays approached Giron regarding a partnership between Springboard and Mission.

31. Giron in turn informed Harmon about the possibility of a partnership between Springboard and Apex.

32. Hays then contacted Harmon about the possibility of a partnership between Springboard and Apex.

33. Hays and Springboard were interested in Apex and Mission because they had a large market share of the Southern California market, a market which Springboard wanted to access.

34. In March 2014, Hays and Harmon met in Phoenix, Arizona to discuss a possible partnership between Springboard and Apex.

5

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

35. At that March 2014 meeting, Harmon explained to Hays his background in medical staffing and the business operations of Apex.

36. Harmon and Hays had further discussions about the debt obligations of Apex, including an IRS payroll tax liability.

37. At that March 2014 meeting Hays explained to Harmon his idea for the structure of a partnership between Springboard, Apex, and Mission.

38. The plan proposed by Hays at the March 2014 meeting had two phases.

39. In Phase One, Springboard would essentially take over all of Apex's and Misson's staffing business. All business would be run using the Springboard brand. Springboard would provide all administrative support to run the businesses. Springboard could also keep 25% of net income received from its operation of Apex's and Mission's business.

40. In Phase One, Apex and Mission would be paid the other 75% of net income from the conduct of their business by Springboard. In addition to the net income split, if Apex and Mission achieved a certain revenue goal after 15 months, they would each receive 5% of Springboard's undiluted shares.

41. In Phase Two, both Giron and Hamon would transition into full time W-2 employees of Springboard, with the potential for options for additional shares in Springboard.

42. It was Harmon's understanding that the proposal was split into two phases—profit sharing first, then equity and employment—in an effort to settle Apex's debts.

*Apex, Mission, and Springboard Strike a Deal*

43. After the March 2014 meeting, the discussions between Apex, Mission, and Springboard were committed to writing.

6

44. On April 25, 2014, Hays sent to Giron and Harmon a letter on Springboard letterhead outlining his two-phase proposal (the "Letter"). (Exhibit 2, 4/25/14 Letter.)

45. The Letter stated that "Springboard has engaged and focused management committed to building a firm with national presence," and also that Springboard has "a strong, transparent culture and management with a vision that breeds success." Id.

46. The Letter set forth the terms of Springboard's two-phase proposal.

47. The Letter stated that in Phase One, Apex and Mission would "integrate California business" into Springboard. Id.

48. The Letter stated that in Phase One there would be a "Net Income Split as follows, 75% Apex/Mission, SBI 25%." Id.

49. The Letter stated that in Phase One, Apex and Mission would receive "up to 5% each undiluted shares of SBI vested after 15 months providing 3.5M REV achieved within 15months." Id. (sic)

50. In a separate section, the Letter discussed the terms of Phase Two.

51. The Letter stated that Phase Two would begin "After Phase 1 (15 months), [or] upon mutual agreement." Id.

52. The Letter stated that in Phase Two, Giron and Harmon would "transition to Salaried W-2 employees" of Springboard. Id.

53. The Letter stated that in Phase Two, Giron and Harmon could receive an "additional option grant for up to a total 10% holding each combined Phase I & II." Id.

54. The Letter stated that in Phase Two, these additional options would be "based on

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

7

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

achieving mutually agreed upon performance targets." Id.

55. Harmon received and reviewed the Letter and its terms. Because the framework of the deal was attractive to Apex and Harmon, Harmon signed and initialed the Letter and returned it to Hays and Springboard.

*Apex, Mission, and Springboard Enter into the Services Agreement*

56. On May 27, 2014, Apex, Mission, and Springboard entered into an agreement titled "Services Agreement." (Exhibit 1, Services Agreement.)

57. Harmon was not a party to the Services Agreement as an individual.

58. The Services Agreement laid out the terms by which Springboard would essentially acquire Apex and Mission's business in Southern California.

59. The Services Agreement roughly tracked the same two-phase deal outlined in Hays's April 25, 2014 Letter.

60. The Services Agreement was drafted by Springboard and Hays and the Springboard logo appears at the top of the first page.

61. Under the Services Agreement, Apex and Mission were to continue recruiting and placing contract workers in Southern California, as they had done before, but using instead Springboard's name and brand.

62. Specifically, the Services Agreement required Apex and Springboard to perform the following work under the Springboard umbrella:

> SpringBoard has requested that Apex and Mission recruit and place Contract Workers (as hereinafter defined) pursuant to the terms and conditions set forth in this Agreement. Subject to the provisions of this Agreement, Apex and Mission will diligently recruit Contract Workers and develop business opportunities for SpringBoard using SpringBoard's name. SpringBoard's trade name and marks shall remain the separate intellectual property of SpringBoard, though Apex and Mission are granted use rights under this

8

Agreement. As used in this Agreement, the term "Contract Workers" shall mean temporary healthcare workers placed on job assignments by Apex and/or Mission using SpringBoard's name and agreements in the Southern California Territory as defined in Exhibit A.

(Exhibit 1, at Section 1.)

63. As part of this partnership with Springboard, Apex and Mission would assign their existing customer contracts to Springboard.

64. As part of this partnership with Springboard, all existing Apex and Mission employees would become Springboard employees.

65. Essentially, under the Services Agreement, all of Apex's business was assigned to Springboard.

66. Under the Services Agreement, Apex would deal with much of the day-to-day management of contract workers.

67. Specifically, the Services Agreement required Apex to do the following management of contract workers:

In general, with regard to the Contract Workers assigned under this Agreement, Apex shall perform or cause to be performed the following:

- Providing Contract Workers' time records to SpringBoard in a timely manner;

- Calculating and reviewing hours worked;

- Hiring, assigning, reassigning, counseling, disciplining, and discharging; and

- Handling work-related claims and complaints;

(Exhibit 1, at Section 6.)

68. Springboard would provide some administrative and payroll functions in support of Apex's management of the contract workers. Specifically, the Services Agreement required Springboard to undertake the following:

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

9

- In general, with regard to the Contract Workers assigned under this Agreement, SpringBoard shall perform or cause to be performed the following:

- Maintaining payroll records;

- Calculating and paying wages;

- Withholding and remitting payroll taxes and other government mandated charges;

- Identifying ongoing contract assignments;

(Exhibit 1, at Section 6.)

69. The Services Agreement directed the Parties to split net profits from Apex and Mission's business between them, with 42.75% to Apex, 32.25% to Mission, and 25% to Springboard:

### Billing, Payment of Commissions, and Equity

Apex and Mission agree that all contracts with Contract Workers and healthcare facilities will be executed under the SpringBoard name. Payments for Contract Workers' services shall be sent to SpringBoard's corporate offices. Only those Contract Workers' services billed and paid pursuant to a SpringBoard agreement are eligible for Net Income split and an advance. Apex and Mission will split with SpringBoard the Net Income generated from the Contract Workers after all expenses have been allocated. SpringBoard will provide Apex and Mission with full access to profit and loss statements showing the allocation of expenses, including, but not limited to, corporate overhead, insurance, commissions, and wages. Apex will receive forty-two and three-quarters percent (42.75%) of the Net Income, Mission will receive thirty-two and one-quarter percent (32.25%) and SpringBoard will receive twenty-five percent (25%) of the Net Income from the Contract Workers (collectively "Net Income Split"). SpringBoard will calculate and pay Net Income on a quarterly basis. Quarterly Net Income Split payments will be made on or about the 20th day of the month following the end of the quarter. If Apex or Mission stops providing service under this Agreement, SpringBoard reserves the right to adjust the Net Income Split.

(Exhibit 1, at Section 9.)

70. This profit split was the same deal that Apex and Mission had with Westways, but Westways was not the assignee of Apex and Mission.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

10

71. The Springboard proposal was attractive to Apex because in addition to the same profit split as the deal with Westways, it included potential equity in Springboard.

72. The further compensation to Mission and Apex for their business under the Services Agreement was a stock option grant of up to 5%, provided Mission and Apex's business hit a revenue goal of $3.5 million over the following 15 months.

73. The revenue goal was measured in total gross revenue from Apex and Mission's Southern California business after their agreement with Springboard.

74. This stock option grant in the Services Agreement was consistent with the Letter.

75. The stock option grant in the Services Agreement would vest after fifteen months, and only if Apex and Mission hit the stated revenue goal.

76. Vesting of the stock options after fifteen months was automatic, provided the stated revenue goal was achieved.

77. If the stock option grant based upon the revenue goals were to vest, the Parties were to execute a separate agreement within twelve months of the options vesting.

78. Specifically, in regard to this grant, the Services Agreement stated that:

> SpringBoard shall provide Apex and Mission, or Tom Harmon ("Harmon") and Joe Giron ("Giron"), with a separate stock option grant of up to five-percent (5%) undiluted shares of SpringBoard, Inc. that will vest after fifteen months of execution of this Agreement if Apex and Mission achieve the revenue goal of $3.5 million from Contract Workers. SpringBoard, Apex and Mission, or Harmon and Giron, agree to execute the necessary separate stock option agreements within twelve months.

(Exhibit 1, at Section 9.)

79. The only requirement for the stock option grant to vest was that Apex and Mission's business hit the $3.5 million revenue goal in the following 15 months.

80. Apex further agreed to provisions designed to keep Springboard's proprietary

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

information confidential, as well as a number of other miscellaneous provisions.

81. Phase Two was also included in the Services Agreement.  Section 22 of the Services Agreement contemplated the anticipated future employment by Springboard of both Harmon and Giron after at least fifteen months of profit sharing between Apex and Mission, and Springboard, provided the revenue goals were met.

82. Springboard further pledged that should it employ Harmon or Giron as salaried W-2 employees, it would further offer them "additional stock option grants." (Exhibit 1, at 22.)

83. Specifically, the Services Agreement said this about the prospects of future employment:

**Anticipated Future Employment.**

SpringBoard anticipates that if Apex and/or Mission meet the revenue goal of $3.5 million over the fifteen months following execution of this Agreement, that Harmon and/or Giron will be offered employment directly with SpringBoard as salaried W-2 employees. At SpringBoard's discretion it is anticipated that, based on Harmon's and/or Giron's performance in meeting mutually agreed upon goals, Harmon and/or Giron, or Apex and/or Mission, will be offered additional stock option grants in SpringBoard. Such additional grants will be documented through separate agreements.

(Exhibit 1, at Section 22.)

84. Harmon understood that under the Services Agreement, in return for its business Apex would receive (1) administrative assistance and branding from Springboard; (2) at least fifteen months of profit sharing at 42.75% of the net profits from Apex and Mission's business; and (3) a stock grant of 5% after fifteen months, provided the business achieved $3.5 million in revenue over that time.

85. Harmon also understood that under the Services Agreement, that after the fifteen months of profit sharing, and after hitting the revenue goals he as an individual could potentially become a W-2 employee of Springboard, and had the potential to be

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

awarded additional stock options depending upon his performance.

86. On multiple occasions, Hays represented to Harmon that the 5% stock grant was automatic, conditioned solely upon the $3.5 million revenue goal being hit within 15 months.

87. Apex only entered into the deal with the understanding that Apex would obtain equity in Springboard, and based upon the representations of Hays in the Letter, the Services Agreement, and other communications, the equity grant would be automatic provided the revenue goals were hit.

88. Without the promise of equity in Springboard after fifteen months, the Services Agreement would make no sense for Apex (or Harmon) to enter into.   Apex was already getting the same profit split with Westways, without a limited term, and without assigning its valuable contracts to Westways.

89. If there were no promise of equity in the Services Agreement, or if it were an illusory promise, Apex would be reducing its share of its own net profits for fifteen months, for little to no benefit provided by Springboard, and ultimately give all of its business to Springboard without any further compensation.

90. On the date the Services Agreement was executed, Giron, with Harmon present, questioned Hays about the "up to five percent" language in the Services Agreement. Hays explained that the language was only necessary in case either Harmon or Giron left Springboard or stopped providing services before the 15-month profit split period had run.   Hays further assured Giron and Harmon that if the revenue goals were achieved, Mission and Apex would be entitled to 5% of Springboard's stock.

91. Once again, Harmon relied upon the representations of Hays regarding Apex's automatic entitlement to 5% of Springboard's stock after hitting revenue goals after fifteen months, and executed the Services Agreement.

13

*Apex Provides Services and Achieves the Revenue Goals*

92. The fifteen months following the execution of the Services Agreement were extremely successful for Apex, Mission, and Springboard.

93. By August 27, 2015—fifteen months after the Services Agreement—Apex had achieved total revenue of $4,408,237.00.

94. The quarterly revenue achieved by Apex in the five quarters after execution of the Services Agreement increased every quarter:

| | |
|---|---|
| July to September 2014: | $564,604 |
| October to December 2014: | $775,239 |
| January to March 2015: | $1,033,210 |
| April to June 2015: | $1,055,528 |
| July & August 2015 (2 mos): | $979,656 |

95. Apex met the 15-month, $3.5 million revenue goal set forth in Section 9 of the Services Agreement.

96. In July 2015, after receiving the sales report confirming that Apex had achieved the $3.5 million revenue goal, Harmon called Hays.

97. In that call, Harmon advised Hays that Apex had hit the goal and was entitled to its 5% of Springboard's stock.

98. During that call, Hays congratulated Harmon on achieving the goal, and advised that he would draw up the necessary paperwork.

99. In August 2015, when the fifteen months under the Services Agreement had concluded, Harmon again asked Hays about Apex's entitlement to 5% of

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

14

Springboard's stock.

100.   In response to Harmon's inquiry, Hays once again reassured Harmon that he was working on the paperwork, but that there would be some delay.

101.   At the time, Springboard was facing litigation for alleged labor law violations, and there was also significant turnover in management and accounting. Harmon understood that this turmoil was a contributing factor in the delay.

102.   Relying upon the representations of Hays that the stock grant was coming but simply held up by completing the paperwork, Harmon continued to provide services under the Services Agreement after the fifteen months had expired, and under the same profit sharing arrangement.

*Harmon is Incarcerated for Four Months, but Apex's Revenue Continues to Flow*

103.   Harmon was convicted of DUI on September 10, 2015, just weeks after the fifteen month period in the Services Agreement expired.

104.   Harmon was sentenced to four months of incarceration, to begin on that same date.

105.   Prior to his incarceration, Harmon arranged many of Apex's employee assignments for the fourth quarter of 2015.

106.   Despite Harmon's incarceration for the fourth quarter of 2015, the Southern California market achieved $1,184.909 in revenue for Springboard, an almost 53% increase from the same quarter in 2014.

107.   Harmon kept in contact with Springboard during his incarceration and worked as much as he was able in that situation.

108.   Springboard received over $41,000 in profit during the period of Harmon's

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1    incarceration.

2    109.    Springboard never notified Harmon or Apex that Harmon's incarceration
3    was a failure of Apex to provide services required under the Services Agreement.

4

5    110.    Springboard paid to Apex its full share of the net profits during Harmon's
6    incarceration.

7    111.    Springboard did not deduct any portion of the net profits share paid to Apex
8    during Harmon's incarceration.

9

10   112.    Springboard did not notify Apex or Harmon of any issue with the
11   performance of its work under the Services Agreement during the time of Harmon's
12   incarceration.

13   113.    During the time of Harmon's incarceration, Springboard did not notify Apex
14   or Harmon of any issue arising from Harmon's incarceration that would invalidate
15   or modify Section 9 of the Services Agreement.
16

17   114.    During the time of Harmon's incarceration, and without Harmon's
18   knowledge, Hays took a Springboard employee on a trip to visit Southern California
19   customers—customers who had been with Apex—and represented the employee as
20   the customers' new account manager.  Hays was beginning to cut Harmon out of
21   the very business he brought to Springboard.

22   115.    The Services Agreement states under Section 17 that the agreement may only
23   be amended or terminated by another signed, written agreement between the parties
24   that expressly amends, terminates or supercedes this Agreement.
25

26   116.    Harmon was released on January 10, 2016.

27   117.    Harmon met with Hays on January 14, 2016.
28

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

16

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

118.     At that January 14, 2016 meeting, Hays and Harmon agreed to move on to Phase II of the Services Agreement.

### Harmon Becomes a Full-Time Employee of Springboard

119.     At the January 14, 2016 meeting, Hays presented Harmon with a letter outlining the terms of his employment at Springboard. (Exhibit 3, 1/14/16 Letter.)

120.     Harmon's title at Springboard would be Senior Operations Director.

121.     The January 14 letter set forth Harmon's duties as a full time, W-2 employee of Springboard, which included the following:

SpringBoard, Inc. ("SpringBoard") is pleased to offer you a full-time position with our company. Your initial title will be Sr. Operations Director, and we anticipate that your initial responsibilities will include, but are not limited to, the following:

- Provide mentoring, support and back up service to the Southern California Market that includes but is not limited to; providing direction to the assigned area representative, resolving customer and candidate issues.

- Work with CEO to identify operational improvement opportunities to improve efficiency across all lines of business. Work with operations, sales and accounting to execute on implementation. Perform Annual tasks including but not limited to; 1099, year-end coordination with tax firm.

- Work with CEO to lead the building and development of SpringBoard's Education and Training division, working closely to develop products, recruit educators and trainers and necessary team members to grow the business profitably.

- HAVE FUN, BE YOURSELF

(Exhibit 3, 1/14/16 Letter.)

122.     The letter laid out Harmon's starting salary at Springboard, and also alluded

17

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

to the potential for stock option grants in the future:

> Your starting salary is $190,000, which is subject to periodic review and adjustment, before applicable withholding and taxes, paid on the company's regular paydays. In addition, you will paid $350.00 per pay period ($9,100 annually) as an auto allowance. **You will also receive stock option awards at the discretion of the CEO based on prior and future performance, in SpringBoard, and potential new entity to be established**. Finally, you are eligible for a bonus of up to 50% of your base salary based on the profitability of SpringBoard, and our Education and Training division.

(Exhibit 3, 1/14/16 Letter) (emphasis added.)

123.    These potential future stock option grants were at the discretion of Hays, and were to be based "on prior and future performance." Id.

124.    These potential future stock option grants did not expressly refer back to Phase One of the Services Agreement, nor to Section 9 of that Agreement.

125.    These potential future stock option grants would be made to Harmon for his performance as an employee, not to Apex for previously hitting revenue goals. Id.

126.    Harmon understood these potential future stock options to be a part of Phase Two of the Services Agreement, as set forth in Section 22 of that Agreement.

127.    In 2015, Apex had been paid over $370,000 as part of its profit sharing arrangement with Springboard.

128.    The starting salary for Harmon of $190,000 represented a nearly 50% pay cut from what had been paid to Apex the previous year.

129.    Harmon, however, was still expecting that not only would Apex get its 5% equity interest in Springboard for hitting its revenue goals under Section 9 of the Services Agreement, but he personally would be entitled to up to 5% of Springboard through Section 22 of the Services Agreement and the options available under this

new employment relationship.

130.     Had Harmon known at the time that Springboard and Hays would not honor the 5% stock grant to Apex under Section 9 of the Services Agreement, and would either award too little of an interest or require onerous conditions for Harmon to exercise future options, Harmon would not have accepted the employment offer.

131.     Hays further promised Harmon at the January 14, 2016 meeting that he intended to promote Harmon to President of Springboard within the following six months.

132.     In reliance upon the representations of Hays and the continued good faith of Springboard and Hays, Harmon accepted the full-time employment offer on January 15, 2016.

*Harmon is Immediately Isolated from Former Apex Workers and Clients*

133.     After Harmon accepted the employment offer, Hays immediately moved Harmon from his prior position coordinating what was previously Apex's business in Southern California.

134.     Harmon no longer had contact with Apex's former contract workers or customers.     Instead, Harmon mentored another Springboard employee in coordinating that work, and was ultimately phased out from the business that he had worked so hard do develop since 2011.

135.     Harmon's role focused on developing educational and training options for Springboard clients.

136.     Harmon continued to receive assurances from Hays that Apex would be provided its Springboard stock under the Services Agreement.

137.     Harmon continued to receive assurances from Hays that he would personally

19

1    receive stock options from Springboard for his performance as an employee.

2    138.    Harmon received several bonuses, including a $10,000 bonus, from
3    Springboard due to the massive increase in revenue after his involvement.

5    139.    Hays continued to represent that the delay in awarding stock to Apex and
6    Harmon continued to be a result of some legal and paperwork issues.

7    140.    At the time, Hays represented to Harmon that Hays was attempting to buy
8    out a minority investor. Hays was additionally going through a divorce that touched
9    on Springboard ownership. Harmon accepted these reasons as the basis for the delay
10   in the stock awards.

12   141.    Relying upon Hays's representations, Harmon continued to work faithfully
13   and diligently at Springboard, despite watching his control over Apex's former
14   business be taken from him.

*Hays and Giron Develop Valuable Intellectual Property and a Lucrative Relationship*

17   142.    During this time, Harmon had been working closely with Giron to develop a
18   training curriculum and program that would revolutionize the training of
19   cardiovascular nurses, known as "EP Savant." Harmon and Giron had been working
20   together since 2014 to develop EP Savant, and had also worked with potential
21   customers to assist in developing the program.

22   143.    Harmon not only assisted in developing the program, he also worked to
23   establish relationships with potential customers for EP Savant.

25   144.    One of the relationships that Harmon developed was with Duke University's
26   medical center and several cardiologists at Duke. These cardiologists were not only
27   interested in EP Savant as a training tool at Duke, but also in developing EP Savant
28   into a training program to be used at hospitals worldwide.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

20

145.    Harmon had been building the relationship with Duke since 2014, when he and Giron traveled to North Carolina to present the concept of the training tool.

146.    Duke thought very highly of the EP Savant program, and sought a highly valuable consulting relationship with Springboard to further develop the tool.

147.    In January 2015, Duke entered into a $150,000 contract with Springboard to develop EP Savant into a working prototype. Duke paid Springboard on an hourly and cost basis for the time spent developing the cardiac training tool and the onsite trainer.

148.    In Summer 2016, and due in part to the efforts of Harmon, Springboard delivered to Duke a working prototype of EP Savant.

149.    Duke was thrilled with the working prototype, and immediately entered into discussions with Springboard to co-copyright EP Savant, as well as to market and distribute the program.

150.    Duke further sought to apply the program to other medical disciplines, potentially opening up the program to a virtually unlimited number of markets.

151.    The relationship is highly valuable to Springboard because Duke is a prestigious university and medical program, and lends a great amount of credibility to the training program. With the Duke partnership, Springboard had a product and relationship potentially worth nine figures.

*Springboard Forces Harmon to Sign Restrictive Covenants Without Consideration*

152.    In January 2017, after Duke had expressed its interest in a partnership with Springboard, Hays approached Harmon with an additional agreement he wanted Harmon to sign as a full-time employee of Springboard.

153.    This agreement included Non-Solicitation, Non-Disclosure, and Invention

21

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1   Ownership clauses.

2   154.   Under this agreement, Harmon was purportedly to keep confidential
3   Springboard's trade secrets and proprietary information.

4

5   155.   Also under this agreement, in the event Harmon's employment at
6   Springboard was terminated, he was purportedly restricted from soliciting any
7   Springboard customers or contract workers, or engaging in direct competition with
8   Springboard.

9   156.   Also under this agreement, purportedly any invention or intellectual property
10   developed in whole or in part by Harmon during his time at Springboard would be
11   the property of Springboard.

12

13   157.   As part of the agreement, Harmon also purportedly agreed to the
14   enforceability of the agreement, the reasonableness of its restrictions, any injunctive
15   relief that Springboard might seek to enforce the agreement, and damages for any
16   violation of the agreement.

17   158.   This agreement was presented to Harmon as a condition of his continued
18   employment at Springboard, and without any further consideration.

19

20   159.   This agreement was curiously presented to Harmon after the development of
21   EP Savant, and after Duke expressed its interest in a potentially lucrative partnership
22   to market and sell the program with Springboard.

23   160.   This agreement was also presented to Harmon while Harmon still waited for
24   the stock grant to Apex under the Services Agreement, and while Harmon still
25   waited for stock options to him personally.

26

27   161.   This agreement was accompanied by an oral promise by Hays that the stock
28   grant and options were still coming to Harmon.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

162.    Faced with no other option but to sign the agreement of adhesion presented to him by Springboard, Harmon executed the Non-Solicitation, Non-Disclosure, and Invention Ownership agreement.

163.    Looking back, Harmon believes that Hays induced him to sign the agreement because Hays intended to dishonor the stock agreements and ultimately force Harmon from Springboard's employment—while keeping the programs and relationships Harmon developed, and with restrictions on Harmon's ability to work or compete with Springboard.

164.    Roughly two weeks after Harmon executed the restrictive covenants, Hays promised Harmon that he would soon be promoted to President of Springboard.

*Springboard Presents Phase Two Stock Options to Harmon*

165.    On multiple occasions in 2016, Hays reassured Harmon that his own personal equity interest in Springboard would be forthcoming soon.

166.    For example, on October 3, 2016, Hays e-mailed Harmon and reassured him that the terms of his equity interest were being worked on, but were further delayed by Giron's departure from Springboard.

> Thank you for your patience, as part of this separation with Joe, I'm working to get the option agreement together which will result in a grant to you.

167.    On January 13, 2017, after removing Harmon from any work related to Apex's former business, after continuing to push off Harmon's inquiries about Apex's 5% stock grant, and after securing the restrictive covenants, Hays delivered to Harmon a letter offering stock options. (Exhibit 4, 1/13/17 Option Letter and E-mail.)

168.    The terms of the letter permitted Harmon to purchase 1800 shares of Springboard stock per year for five years, totaling 9000 shares. The per share

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

purchase price was to be $6.780017 per share, as determined by the Board administering the Plan.

169.     The first date on which the option would vest was October 12, 2017. Harmon could purchase 1800 shares after that vesting date each year from October 2017 to October 2021.

170.     Hays provided no information regarding the valuation of the shares nor the percentage ownership of Springboard that the shares represented.

171.     Harmon inquired via e-mail regarding the percentage ownership of Springboard that the 9000 shares represented. Hays responded and advised that it was less than 1%. Id.

172.     These options were offered to Harmon and not to Apex.

173.     Nothing in the Option Letter referred back to Section 9 of the Services Agreement or the revenue goals stated therein.

174.     Instead the Option Letter referred to the terms of Harmon's W-2 employment at Springboard, including his recently-executed restrictive covenants. The Option Letter purported to terminate Harmon's options should he in any way violate the restrictive covenants.

175.     Harmon understood that provided he fulfilled the terms of his restrictive covenants, on October 12, 2017 he would be able to exercise the option and purchase 1800 shares of Springboard stock.

176.     Harmon understood that these options were being offered to him as part of Phase Two of the Services Agreement, and related only to his performance as a W-2 employee of Springboard.

*Springboard Offers More Options with Onerous Conditions and Illusory Promises*

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

177.    On March 31, 2017, Hays e-mailed Harmon with his reassurance that an equity interest in Springboard was forthcoming.    Hays further expressed his satisfaction with Harmon's performance:

> I understand your frustration and I heard you. Growth and providing opportunity for everyone and doing whats best for SpringBoard are my priorities. Moving faster keeps me up at night. I see lots of options for Tom I've just dropped the ball on moving them up the list. Stick with me Tom. Working with you is something I enjoy very much.

178.    From this e-mail and other representations of Hays, Harmon understood that his performance was excellent and that the long-awaited equity interests in Springboard would soon be forthcoming.

179.    On May 19, 2017, Harmon was given his long-promised promotion to President and Chief Strategy Officer of Springboard.

180.    In July 2017, Hays informed Harmon that he was working on restructuring the existing option plan to expand the option pool.

181.    When Hays informed Harmon of his intent to restructure the existing option plan, Harmon believed that Apex would finally be receiving the stock that had been earned in August 2015, and that Harmon would finally receive the options he had earned through his diligent work as a Springboard employee.

182.    On August 17, 2017, Hays provided to Harmon an option package for 80,000 shares of Springboard. (Exhibit 5, 8/17/17 Option Proposal.)

183.    Hays represented that 80,000 shares represented 4% of the outstanding shares of Springboard.

184.    Hays provided no explanation how or why, in January 2017, 9,000 shares represented 1% of the outstanding shares, yet in August 2017, 80,000 shares represented just 4% of the outstanding shares.

185.    The Option provided Harmon the opportunity to purchase 80,000 shares of Springboard on the following day, August 18, 2017, at a per share price of $2.08 per share:

> I am happy to advise you that you have been selected by the Board of Directors (the "Board") administering the 2017 Equity Incentive Plan (the "Plan") of Springboard, Inc., an Arizona corporation (the "Company"), to receive an incentive stock option and that on August 18, 2017 (your "Grant Date"), you were granted an option to purchase eighty thousand (80,000) shares of the Company's Series B Common Stock (no par value) (the "Stock") at a price of Two Dollars and 08/100 ($2.08) per share (the "Option"), which the Board has determined to be the Fair Market Value of the Stock on the Grant Date.

(Exhibit 5.)

186.    The Option was for Harmon to exercise as an individual.

187.    The Option was not presented to nor did it belong to Apex.

188.    The Option referred to several terms of Harmon's W-2 employment, including the restrictive covenants he had signed in January 2017.

189.    The Option was purportedly immediately revocable "after termination of your relationship with [Springboard] for any reason." (Exhibit 5, at Section 3.)

190.    The Option's immediate revocation upon termination of Harmon's employment was a new term that was not included in the options presented on January 13, 2017, just seven months prior.

191.    The Option was further conditioned upon Harmon's compliance with the restrictive covenants he signed.

192.    The Option contained an onerous clawback provision that had never previously been discussed with Harmon. Pursuant to the clawback provision, any shares purchased under the Option would be returned to Springboard involuntarily

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

26

and for a re-purchase price of $1.00 per share (less than half of the purchase price) if "it comes to the attention of the Committee that you are consuming alcohol, whether at work or outside of work…" (Exhibit 5, at Section 6.)

193.  Essentially, if in the sole discretion of the plan Committee, Harmon was consuming alcohol at any time, all of Harmon's interest in Springboard could be immediately clawed back to Springboard at a price of less than half of what Harmon paid.

194.  Harmon had not had an alcohol-related issue since his release from incarceration for DUI some 18 months prior to the Option being presented to him. Harmon had completed his probation, and completed it early due to his good behavior and compliance with the terms.

195.  Harmon was shocked by the terms of the Option, and by the prospect that any share purchase he made could essentially be taken from him—at less than half the price he paid—whenever the Committee decided that he had been drinking. There was no testing or other procedure listed in the Option for the Committee to make this determination—it was simply within the Committee's discretion to take Harmon's shares when it decided Harmon had been drinking.

196.  If in 2014 when Apex entered into the Services Agreement, Harmon knew that Springboard would condition his Phase Two employment and stock options upon his abstention from alcohol, he would not have entered into the agreement.

197.  If in 2014 when Apex entered into the Services Agreement, Harmon knew that Springboard's promises of equity to either Apex or Harmon would be revocable whenever Springboard terminated Harmon or if the Committee decided Harmon had consumed alcohol, Harmon would not have allowed Apex to enter into the agreement.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

198.    Under duress, at the insistence of Hays, and apparently facing the loss of everything Harmon had worked so hard for, Harmon signed the Option.

199.    On August 18, 2017, Harmon asked Hays to clarify the covenants in the option agreement as the restrictions violated his right to privacy and given his "at will" employment status, Hays clearly was able to take away the options at any time. Hays confirmed that these covenants were part of the option agreement.

200.    On August 21, 2017, Harmon gave notice to Hays and Chief Operating Officer Jacqueline Hein that this condition of his employment was discriminating against Harmon as the other employee that received an option grant on the same date did not have the alcohol "clawback" provision.  Hays asked Harmon to leave the company premises less than an hour later.

### Springboard Terminates Harmon's Employment and Keeps Apex's Business

201.    After August 21, 2017, Harmon and Hays met four times over the next several days to see if there was a constructive path forward, however there was no agreement.

202.    On August 28, 2017, Hays gave Harmon an ultimatum.  Either he would accept a new position that had no interaction with any of the staffing employees, or he would be terminated.   The new position had few responsibilities and less prestigious title than his current title of President and Chief Strategy Officer.

203.    Hays terminated Harmon's employment August 30, 2017, canceling the options Hays had given to Harmon less than two weeks prior. There were no written or verbal warnings, nor had there ever been any discussion that Harmon's performance was not satisfactory.

204.    To date, neither Harmon nor Apex have received a *single* share of Springboard.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

*Hays Devalues Springboard by Transferring a Valuable Asset to Himself*

205.     As discussed previously, Springboard's partnership with Apex and Mission was highly successful from its inception in May 2014 forward.

206.     In addition to the ever-increasing income Springboard received from its acquisition of Apex and Mission's business, Springboard also had potential through EP Savant and the partnership with Duke to be part of a training and education program that could garner up to nine figures worth of value.

207.     EP Savant was developed from 2014 to a working prototype delivered to Duke in Summer 2016.

208.     The program was developed using funds from Springboard, by employees or contractors paid by Springboard, and using Springboard's resources and brand.

209.     In Summer 2016, Duke expressed its satisfaction with the working prototype of EP Savant, and proposed a potentially extremely lucrative partnership with Springboard to develop not only EP Savant but also training programs in other disciplines for marketing and sale worldwide.

210.     With the success of Springboard's partnership with Apex and Mission already realized, and with Springboard's educational work with Harmon and Giron paying off potential dividends well into the millions, Hays saw the need to keep these opportunities for himself.

211.     On June 21, 2016, Hays incorporated Springboard Healthcare Group, LLC.

212.     Hays is the manager and sole member of Springboard Healthcare Group, LLC.

213.     Hays is the sole owner of Springboard Healthcare Group, LLC.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

29

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

214.   In July 2016, Hays and Duke signed a co-copyright agreement, but Hays signed the agreement as the manager of Springboard Healthcare Group, LLC.

215.   To the extent that Springboard owned EP Savant, Springboard had transferred those ownership rights to Springboard Healthcare Group, LLC.

216.   Hays and Springboard never disclosed to Harmon that Springboard's rights in EP Savant had been transferred to a separate entity controlled and owned solely by Hays.

217.   Harmon understood that the rights to EP Savant might be transferred to a subsidiary to permit the partnership with Duke, but understood that the subsidiary would be wholly owned by Springboard.

218.   At the time Hays transferred the rights to EP Savant from Springboard to Springboard Healthcare Group, LLC, Apex already had a vested right to 5% of the stock of Springboard.

219.   The ownership of EP Savant is currently in dispute between Giron and Springboard, and litigation is currently pending in this Court at CV2017-013928, filed October 30, 2017.

220.   It is clear that Hays transferred the rights to EP Savant in order for him to take the value of EP Savant and the potential co-copyright partnership with Duke for himself, and to the detriment of those having ownership rights to or options in Springboard.

221.   Hays has confirmed that Springboard Healthcare Group, LLC is an entirely separate entity from Springboard. In an e-mail dated June 29, 2017, Hays informed Harmon that "there is no controlling or equity interest from SpringBoard Inc to SpringBoard Healthcare Group LLC."   Meaning, Springboard—and its shareholders—have no equity interest in Springboard Healthcare LLC, the entity to

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1    which Hays transferred an extremely valuable intellectual property right.

2    222.    Hays's actions damaged the value of shares of Springboard in an amount that

3    is immeasurable at this point, but is significant.

4

5    223.    As shareholders in Springboard under both the Services Agreement and the

6    option promises, Apex and Harmon are owed a duty by Hays to not damage the

7    value of their shares.

8                              **COUNT ONE**

9

10                **(Breach of Contract between Apex and Springboard)**

11   224.    All preceding paragraphs are incorporated into this Count as though they

12   were set forth fully herein.

13

14   225.    Apex and Springboard entered into a valid agreement on May 27, 2014.

15   226.    Under the agreement between Apex and Springboard, provided Apex and

16   Mission met their revenue goals, Apex and Mission would be awarded "up to five-

17   percent (5%) undiluted shares of SpringBoard, Inc." (Exhibit 1, Section 9.)

18

19   227.    Hays represented that the only reason the agreement included "up to" the five

20   percent was if either Harmon or Giron stopped providing services during the 15-

21   month revenue goal period.

22   228.    With that understanding, Apex executed the Services Agreement.

23

24   229.    Apex assigned its valuable customer contracts to Springboard.

25   230.    Apex permitted its employees to become employees of Springboard.

26

27   231.    Apex performed the services required under the Services Agreement.

28   232.    Apex and Mission met the $3.5 million revenue goal set in Section 9 of the

31

Services Agreement.

233.    Hays acknowledged that the $3.5 million revenue goal had been met.

234.    Springboard never delivered to Apex the 5% equity interest promised in the Services Agreement.

235.    Springboard never delivered to Mission the 5% equity interest promised in the Services Agreement.

236.    Apex has never received a single share of Springboard.

237.    By failing to deliver the 5% equity interest in Springboard to Apex, Springboard breached the Services Agreement.

238.    Apex was damaged by Springboard's breach of the Services Agreement.

239.    The damages from Springboard's breach include the 5% equity interest in Springboard to be delivered on August 27, 2015, as well as any profits, shares, dividends, or distributions that equity interest would have generated from that date to the present.

## COUNT TWO

### (Breach of Contract between Harmon and Springboard)

240.    All preceding paragraphs are incorporated into this Count as though they were set forth fully herein.

241.    Springboard and Harmon entered into a series of valid agreements regarding Harmon's full-time employment at Springboard.

242.    The first such agreement was the Services Agreement. Though Harmon as an individual was not a party to the Services Agreement, the Services Agreement

32

contemplated Harmon's eventual employment by Springboard, and further contemplated that Harmon personally would receive equity in Springboard.

243.    The second such agreement was the January 14, 2016 letter offering Harmon his employment.    While the letter purported to offer Harmon only "at will" employment, it set forth terms that went well beyond an "at will" relationship. Most notably, it promised to Harmon "stock option awards at the discretion of the CEO based on prior and future performance, in SpringBoard, and potential new entity to be established."

244.    The third such agreement was the January 13, 2017 stock option grant, which included a vesting date of October 12, 2017, when Harmon would have the option to purchase up to a 1% interest in Springboard per year until 2021 at a price of $6.780017 per share. This option was conditioned only upon Harmon's compliance with the restrictive covenants he signed, and not on continued employment with Springboard or a determination of whether Harmon had consumed alcohol.

245.    The fourth such agreement was the August 18, 2017 stock option grant, which did not purport to modify or supersede the January 13, 2017 grant.    This option was signed under pressure and duress from Springboard and Hays.    This option contained conditions that went well beyond the January 13, 2017 grant, including the continued employment of Harmon by Springboard, and the ability for the plan committee to revoke the option and claw back any shares purchased by Harmon should the committee, in its sole discretion, decide that Harmon had consumed alcohol.

246.    Springboard breached every single one of these agreements.

247.    Springboard has never provided even one share of its stock to Harmon.

248.    Springboard did not provide any stock grants to Harmon under the Services

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

33

1   Agreement.

2   249.    Springboard did not provide any stock options to Harmon under the January

3   14, 2016 letter offering employment.

4

5   250.    Springboard did not provide any stock to Harmon under the January 13, 2017

6   option grant, nor did Springboard allow the option to vest prior to attempting to

7   supersede the agreement in August 2017.

8   251.    Springboard did not provide any stock to Harmon under the August 18, 2017

9   option grant, and Springboard terminated Harmon prior to allowing the opportunity

10   to purchase any stock under the option.

11

12   252.    Springboard added onerous and unconscionable terms to the August 18, 2017

13   option grant which ultimately made the promises therein illusory.

14   253.    Springboard forced Harmon to sign the August 18, 2017 option grant under

15   great duress and with the threat of Harmon (and Apex) losing everything they had

16   worked for since 2011.

17

18   254.    Harmon was damaged by Springboard's breach.

19   255.    The damages caused to Harmon by Springboard's breach include a 5% equity

20   interest in Springboard, promised and re-promised to Harmon personally since

21   2014. The damages further include the profits, shares, dividends, or distributions

22   that equity interest would have generated from January 14, 2016 to the present. The

23   damages further include damages to Harmon's reputation and standing in the

24   industry, as well as his ability to do the work he has done at a high level for over six

25   years.

26

27                                **COUNT THREE**

28   **(Breach of the Implied Covenant of Good Faith and Fair Dealing with Springboard)**

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

256.    All preceding paragraphs are incorporated into this Count as though they were set forth fully herein.

257.    In Arizona, every contract includes an implied covenant of good faith and fair dealing, in which each party to a contract is entitled to receive the benefit of the bargain they made.

258.    An covenant of good faith and fair dealing was implied into every contract between Apex, Harmon, and Springboard.

259.    Apex and Harmon were entitled to expect that Springboard would act in good faith, and that Apex and Harmon would get the benefit of the bargain they made.

260.    Instead, Springboard acted in bad faith, and did not allow Apex or Harmon to receive the benefit of their bargain.

261.    Springboard entered into the agreements with Apex and Harmon knowing the benefits that Apex and Harmon expected from these bargains, and knowing that Springboard would not permit Apex and Harmon to receive these benefits.

262.    Springboard's conduct constitutes a breach of the implied covenant of good faith and fair dealing.

263.    Harmon and Apex have been damaged by Springboard's breach.  These damages include the benefits that Harmon and Apex expected from the bargains they made, including but not limited to equity interests in Springboard and the profits derived therefrom.

## COUNT FOUR

### (Breach of Fiduciary Duty against Hays)

264.    All preceding paragraphs are incorporated into this Count as though they

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

were set forth fully herein.

265.     As a director of Springboard, Hays has a fiduciary duty to Springboard's shareholders to ensure that the value of their shares are not damaged by the actions of the directors.

266.     As a director of Springboard, Hays has a fiduciary duty to Springboard as well as its shareholders to not take opportunities belonging to the company for his own benefit.

267.     Under the agreements listed above in Counts One and Two, both Apex and Harmon are shareholders in Springboard.

268.     Apex's equity interest in Springboard should have been delivered on August 27, 2015.

269.     Harmon's equity interest in Springboard should have been delivered on several occasions, beginning January 14, 2016 and running through Harmon's termination.

270.     Apex and Harmon will prevail on their breach of contract claims, and will be considered shareholders in Springboard from the dates listed in the Paragraphs above.

271.     Beginning in 2015, Hays orchestrated a scheme for Springboard to develop a valuable intellectual property asset in EP Savant at Springboard's expense, but then transfer that asset to an LLC controlled solely by Hays.

272.     Hays incorporated Springboard Healthcare Group LLC in June 2016.

273.     Hays purported to transfer Springboard's rights to EP Savant to Springboard Healthcare Group LLC, an entity owned and controlled solely by Hays.

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

274.    Hays's transfer of Springboard's rights in EP Savant to Springboard Healthcare Group LLC was a breach of his fiduciary duties to Springboard shareholders, as he had both (1) damaged the value of their shares, and (2) usurped a business opportunity belonging to Springboard for himself.

275.    As shareholders in Springboard, Apex and Harmon were damaged by Hays's breach, including but not limited to the difference in value of Springboard's shares before and after the transfer of Springboard's rights in EP Savant to Springboard Healthcare Group LLC.

## COUNT FIVE

### (Common Law Fraud against Springboard & Hays)

276.    All preceding paragraphs are incorporated into this Count as though they were set forth fully herein.

277.    As described in detail in the previous paragraphs, Hays made multiple statements to Apex and Harmon in an effort to induce Apex and Harmon to enter into the Services Agreement and a full time W-2 employment arrangement, respectively.

278.    Among these statements were that Apex would receive a 5% equity interest in Springboard immediately upon its meeting the 15-month revenue goals.

279.    Among these statements were that Harmon would personally receive a 5% equity interest in Springboard provided he accepted full time W-2 employment with Springboard.

280.    Throughout the life of the relationship between Harmon, Apex, Hays, and Springboard, Hays made multiple statements to Harmon reassuring him that Apex and Harmon would receive their equity interest, but the matter was held up by

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

paperwork, internal turmoil at Springboard, pending legal matters, or other impediments.

281.    Harmon and Apex relied upon the representations of Hays as to the forthcoming equity interests.

282.    Harmon and Apex's reliance upon Hays's representations was reasonable.

283.    At the time Hays made these statements he knew them to be false.

284.    At the time Hays made these statements, Hays knew that he would not cause Springboard to deliver to either Apex or Harmon any equity interest in Springboard.

285.    At the time Hays made these statements, Hays intended to induce reliance by Apex and Harmon in these statements. The reliance that Hays intended to induce was for Apex to enter into the Services Agreement and assign its valuable contracts to Springboard, and for Harmon to accept full time employment with Springboard and develop valuable intellectual property and relationships for Springboard.

286.    Hays never cause Springboard to deliver even one share of stock to either Apex or Harmon.

287.    Apex and Harmon have been damaged by Hays's misrepresentations and fraud in an amount including but not limited to the 5% equity interests in Springboard that they each had been promised by Hays from 2014 to the present, as well as all profits, shares, dividends, or distributions those equity interests would have generated from August 27, 2015 (Apex) and January 14, 2016 (Harmon) to the present.

## COUNT SIX

**(Material Misrepresentation under Securities Act § 10b and SEC Rule 10b-5, as well as A.R.S. § 44-1991(A))**

38

288.    All preceding paragraphs are incorporated into this Count as though they were set forth fully herein.

289.    Hays made multiple material misrepresentations to Apex and Harmon concerning the Springboard stock or stock options to which Apex and Harmon were to be entitled for (a) merging Apex into Springboard, and (b) accepting full time employment with Springboard.

290.    First, with respect to the Services Agreement, Hays promised on multiple occasions to deliver "undiluted" stock options totaling 5% of Springboard to Apex, as shown by the Letter Agreement and Services Agreement, both of which reference equity compensation, despite Hays' intention never to fulfill that promise.

291.    The stock options for 1800 shares of Springboard which Hays purported to grant Harmon in January 2017 (and then attempted to unilaterally change in August 2017) contained no dilution protections and were highly restricted.

292.    In August 2017, Hays again promised to deliver to Harmon stock options for up to 5% of Springboard stock, but instead Hays attached such onerous conditions to the option that he knew that he was able to rescind the option simply by terminating Harmon before it was exercised, or if Harmon had exercised the option prior to his termination, having the plan committee decide on its own that Harmon had consumed alcohol and claw back the entirety of Harmon's interest—at a significant loss to Harmon.

293.    Hays represented to Harmon that Springboard would be the owner of EP Savant and its derivative products, so that when Harmon and Apex received the 10% equity in Springboard to which they were entitled, Harmon and Apex's ownership of Springboard would equate to ownership in EP Savant and its derivative products. Ultimately, Hays purported to consolidate EP Savant with Springboard's existing operations and grant Harmon and Apex their stock in Springboard. However, Hays

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

never intended to grant Harmon and Apex the Springboard stock, and instead transferred EP Savant into the Hays-controlled and owned Springboard Healthcare Group LLC, for little or no consideration, thereby appropriating the value of EP Savant for himself and materially impairing the value of the stock options to which Harmon and Apex are entitled.

294.    Harmon and Apex relied on Hays' misrepresentations and have incurred damages as a result of them, specifically, in an amount equivalent to the 10% of Springboard stock as well as the proportionate value of EP Savant and its derivative products to which Harmon and Apex's 10% ownership in Springboard should have entitled him.

## **PRAYER FOR RELIEF**

WHEREFORE, for their Complaint as fully stated above, Plaintiffs pray for judgment in their favor and against Defendants as follows:

A. For damages for breach of contract in the amount of the value of 5% of Springboard's outstanding shares on August 27, 2015;

B. For damages for breach of contract for 5% of the profits, shares, dividends, or distributions Harmon's equity interests would have generated from August 27, 2015 to the date of the damages award and beyond;

C. For damages for breach of contract in the amount of the value of 5% of Springboard's outstanding shares at the date of Harmon's employment by Springboard;

D. For damages for breach of contract in the amount of the profits, shares, dividends, or distributions Harmon's equity interests would have generated from January 14, 2016 to the date of the damages award and beyond;

E. For fraud damages in the amount of 10% of the value of Springboard's outstanding shares and any income derived therefrom;

F. For fraud damages for the difference in value between the 5% held by Apex and the 5% held by Harmon before and after the transfer of EP Savant to Springboard Healthcare Group, LLC;

G. For punitive damages against Hays for his fraud in an amount to be determined by a jury;

H. Awarding Plaintiffs their attorneys' fees, costs, and expenses pursuant to both the applicable agreements as well as A.R.S. 12-341 and 12-341.01, as well as any other applicable statute including 12-349; and

I. Awarding such other and further relief as this Court deems just and proper.

DATED this 1st day of November, 2017.

LAW OFFICE OF CHRISTOPHER GOODMAN PLC

By /s/ Christopher Goodman

Christopher M. Goodman
45 W. Jefferson St., Suite 512
Phoenix, Arizona 85003
Attorney for Plaintiffs

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

41

MICHAEL K. JEANES
CLERK OF THE SUPERIOR COURT
MARICOPA COUNTY, ARIZONA
WWW.CLERKOFCOURT.MARICOPA.GOV

Loc: 0010330   DP# 03009

| Description | Qty | Amount |
|---|---|---|
| ------ CASE# CV2017-014286 ------ | | |
| CIVIL NEW COMPLAINT | 001 | 322.00 |
| SUB TOTAL | | 322.00 |
| TOTAL AMOUNT DUE | | 322.00 |
| CHECK (1059) | | 322.00 |
| TOTAL PAID | | 322.00 |
| CHANGE | | 0.00 |

Date 11/01/2017 Time 12:22:40
Receipt# 26237978

Harmon/atty pb Law Offices of Christophe
r Goodman

Keep This Receipt For Your Records

# EXHIBIT 1



## SERVICES AGREEMENT

This Agreement for Recruiting and Placing Temporary Healthcare Workers (this "Agreement") is effective as of May ___, 2014, ("Effective Date") by and between SpringBoard, Inc., an Arizona corporation ("SpringBoard"), Apex Medical Staffing, LLC, a California limited liability company ("Apex"), and Mission Medical Services, Inc., a California corporation ("Mission"). Each of SpringBoard, Apex and Mission shall sometimes be referred to in this agreement as a "party" and collectively as the "parties".

1.  **Statement of Work**

    SpringBoard has requested that Apex and Mission recruit and place Contract Workers (as hereinafter defined) pursuant to the terms and conditions set forth in this Agreement. Subject to the provisions of this Agreement, Apex and Mission will diligently recruit Contract Workers and develop business opportunities for SpringBoard using SpringBoard's name. SpringBoard's trade name and marks shall remain the separate intellectual property of SpringBoard, though Apex and Mission are granted use rights under this Agreement. As used in this Agreement, the term "Contract Workers" shall mean temporary healthcare workers placed on job assignments by Apex and/or Mission using SpringBoard's name and agreements in the Southern California Territory as defined in Exhibit A.

2.  **Contract Workers Provide Services to Healthcare Facilities**

    Apex and Mission will recruit and place Contract Workers at healthcare facilities to provide services using SpringBoard's name. When placing Contract Workers at healthcare facilities and when interacting with Contract Workers or potential contract workers, Apex and Mission will use exclusively the name "SpringBoard" and will use its best efforts to increase SpringBoard's branding and name recognition in the market. SpringBoard is not Apex's or Mission's legal partner, co-venturer, joint venture, principal, agent, insurer, joint employer or representative. No Contract Worker has any claim to SpringBoard's or Apex's or Mission's revenues related to their work. SpringBoard, Apex and Mission are solely responsible for meeting their goals for profits, costs, production, and scheduling. Contract Workers have no authority to legally bind Apex, Mission or SpringBoard.

    Apex and Mission agree that each Contract Worker shall possess, in all material respects, the skills and abilities required to provide such services, including the necessary credentialing paperwork to meet SpringBoard's Joint Commission Certification.

3.  **Contract Workers' Compensation**
    SpringBoard will pay, or cause to be paid, the wages of the Contract Workers, and SpringBoard will be responsible for withholding, or causing the withholding of, all applicable federal, state and local taxes, including Federal Insurance Contributions Act ("FICA") taxes, from Contract Workers' wages and SpringBoard shall provide, or cause to be provided, workers' compensation coverage meeting statutory coverage limits.

4.  **Direction and Supervision**
    Apex and Mission are recruiting and supplying the Contract Workers to healthcare facilities to supplement their work force. SpringBoard employees may communicate directly with the Contract Workers placed by Apex and/or Mission on the job assignment as necessary to further SpringBoard's business interests. SpringBoard is not supplying persons to supervise or oversee the Contract Workers during their assignment to healthcare care facilities unless otherwise agreed to in writing.

5.  **Replacement or Release of Unsatisfactory Workers**
    Apex, Mission and SpringBoard have the right at all times to end the assignment of any Contract Worker.

6.  **Parties' Responsibilities**
    In general, with regard to the Contract Workers assigned under this Agreement, SpringBoard shall perform or cause to be performed the following:

    - Maintaining payroll records;
    - Calculating and paying wages;
    - Withholding and remitting payroll taxes and other government-mandated charges;
    - Identifying ongoing contract assignments;

    In general, with regard to the Contract Workers assigned under this Agreement, Apex shall perform or cause to be performed the following:

    - Providing Contract Workers' time records to SpringBoard in a timely manner;
    - Calculating and reviewing hours worked;
    - Hiring, assigning, reassigning, counseling, disciplining, and discharging; and
    - Handling work-related claims and complaints;

    SpringBoard, Apex and Mission shall be responsible for maintaining personnel records, including necessary credentialing paperwork to meet SpringBoard's Joint Commission Certification. Apex and Mission will transfer all Contract Worker personnel files to SpringBoard within 30 days of executing this Agreement. At no time will Apex or Mission remove any personnel files of Contract Workers without SpringBoard's prior written authorization.

7.  **Disclaimer of Liability**
    SpringBoard has no liability to Apex or Mission for any claim, loss, or liability of any kind resulting from or otherwise arising out of any of the following:

2

a. Apex's or Mission's failure to adequately supervise or control Contract Workers, provide a safe, discrimination free, and lawful work environment or safeguard Apex's or Mission's premises, processes, or systems; or without SpringBoard's express prior written approval, entrusting Contract Workers with unattended premises, cash, checks, keys, credit cards, merchandise, confidential or trade secret information, negotiable instruments, or other valuables.

b. Claims by Contract Workers for benefits, compensation, damages, discrimination, harassment, wrongful termination, contributions, or penalties under any employee benefit plans sponsored and maintained by Apex or Mission, whether or not Apex's or Mission's plans exclude Contract Workers from coverage.

c. Promises of increased compensation, bonuses, or benefits made by Apex or Mission to Contract Workers.

d. Claims by any person relating to Apex's or Mission's service.

e. Apex's or Mission's assigning Contract Workers to duties different from their original duties for which Apex or Mission supplied the Contract Worker to a healthcare facility or Apex's or Mission's making substantial changes to Contract Workers' job duties or risks without SpringBoard's prior written approval.

f. The conduct of Apex's or Mission's officers, employees, and agents.

g. Failure by Apex or Mission to provide Contract Workers with a safe work site.

h. Claims for special, indirect, consequential, punitive, or lost profit damages.

i. A violation or breach by Apex or Mission of any law, statute, or regulation.

j. Property damage or personal injury, including death, arising out of or resulting from acts or omissions of the Contract Workers.

**8.    Indemnification**

Apex and Mission, except to the extent specifically disclaimed or limited in this Agreement, indemnify and hold SpringBooard harmless from and against all costs and expenses, including reasonable attorneys' fees and the reasonable costs of investigation resulting from, or arising out of, any violation of Federal, state or common law arising out of any actions of Apex or Mission, or Tom Harmon ("Harmon") and Joe Giron ("Giron").

**9.    Billing, Payment of Commissions, and Equity**

Apex and Mission agree that all contracts with Contract Workers and healthcare facilities will be executed under the SpringBoard name. Payments for Contract Workers' services shall be sent to SpringBoard's corporate offices. Only those Contract Workers' services billed and paid pursuant to a SpringBoard agreement are eligible for Net Income split and an advance. Apex and Mission will split with SpringBoard the Net Income generated from the Contract Workers after all expenses have been allocated. SpringBoard will provide Apex and Mission with full access to profit and loss statements showing the allocation of expenses, including, but not limited to, corporate overhead, insurance, commissions, and wages. Apex will receive forty-two and three-quarters percent (42.75%) of the Net Income. Mission will receive thirty-two and one-quarter percent

(32.25%) and SpringBoard will receive twenty-five percent (25%) of the Net Income from the Contract Workers (collectively "Net Income Split"). SpringBoard will calculate and pay Net Income on a quarterly basis. Quarterly Net Income Split payments will be made on or about the 20th day of the month following the end of the quarter. If Apex or Mission stops providing service under this Agreement, SpringBoard reserves the right to adjust the Net Income Split.

SpringBoard will provide Apex with an advance of ten-percent (10%) of the previous month's billed services. Payments will be made on or about the 20th day of the following month. SpringBoard will make any necessary adjustments to the Net Income Split at the quarterly reconciliation.

SpringBoard shall provide Apex and Mission, or Tom Harmon ("Harmon") and Joe Giron ("Giron"), with a separate stock option grant of up to five-percent (5%) undiluted shares of SpringBoard, Inc. that will vest after fifteen months of execution of this Agreement if Apex and Mission achieve the revenue goal of $3.5 million from Contract Workers. SpringBoard, Apex and Mission, or Harmon and Giron, agree to execute the necessary separate stock option agreements within twelve months.

In the event no agreement/promissory note is reached with Harold Sterling and West Ways Staffing, Joe Giron may receive an advance towards commissions not to exceed $7500. The $7500 to be repaid by Joe within 90 days.

10. **Termination of this Agreement**

Any party may terminate this Agreement by giving 60 days' written notice of termination to the other parties. Any party may give written notice to the other parties of a breach of this Agreement, and if the breaching party fails or refuses to remedy such default within ten (10) days of the date of said notice, the notifying party may terminate this Agreement immediately by a second written notice and termination shall be effective as of the date of the second notice. Except as otherwise expressly provided in this Agreement, termination for default shall be without prejudice to any other rights or claims the aggrieved party may have against the other party. Breaches shall be deemed to include but not be limited to (i) material failure of a party to fulfill its obligations under this Agreement, (ii) an adjudication of bankruptcy or insolvency under any bankruptcy or insolvency law, or (iii) the commission of a receiver for the business or property of a party or its making of any general assignment for the benefit of its creditors. The provisions of Paragraphs 6, 7, 8, 10, 11, 12, 13, 18, 19, and 20 of this Agreement will remain in effect after termination. Termination of this Agreement prior to execution of the stock option agreement will eliminate any potential stock option grant.

11. **Insurance and Liability**

During the term of this Agreement, SpringBoard will maintain, or cause to be maintained, the following insurance coverages:

4

| Type | Coverage Limits |
|------|-----------------|
| a.  Standard workers' compensation | Statutory |
| b.  General liability | $ 1,000,000 |
|     i.  Each Occurrence | $ 1,000,000 |
|     ii.  General Aggregate | $ 2,000,000 |
| c.  Comprehensive automobile liability | $ 1,000,000 |
|     (Hired, Non-Owned) | |
| d.  Excess umbrella liability | $ 2,000,000 |

Apex, Mission and SpringBoard agree that SpringBoard's total potential liability to Apex and/or Mission for any claims, losses, expenses, or damages whatsoever arising out of or in any way related to this Agreement from any cause or causes, including SpringBoard's negligence, will not exceed the total amount paid to SpringBoard or paid on SpringBoard's behalf by its insurers under these coverages in settlement or satisfaction of Apex's and/or Mission's claim.

EXCEPT IN CONNECTION WITH ANY PAYMENT OBLIGATIONS OR ANY INDEMNITIES HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR EXPENSES OR LOST PROFITS (REGARDLESS OF HOW CHARACTERIZED AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OR ACTION (WHETHER IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, STATUTORY LIABILITY OR OTHERWISE).

12.  **Confidential Information**

Apex and Mission recognize that they may have access to certain information that SpringBoard considers to be proprietary and confidential, and designate as such. Apex and Mission agree to treat this information as confidential and not to disclose it to any third person.

Proprietary or confidential information does not include any of the following:

a.  Information that, at the time of disclosure, is generally available to the public.

b.  Information that, after disclosure, becomes generally available to the public by publication or otherwise.

c.  Information that was in Apex's of Mission's possession prior to disclosure and that was not acquired directly or indirectly from SpringBoard.

d.  Information that Apex or Mission received after the time of disclosure from a third party that did not impose an obligation of confidentiality and did not acquire any such information directly or indirectly from SpringBoard.

e.  Information as may be authorized by SpringBoard to be disclosed.

13.  **No Solicitation or Hiring of Contract Workers by Apex or Mission**

During the term of this Agreement and for 180 days after the effective date of any party's termination of this Agreement, Apex and Mission agree not to directly or indirectly solicit, retain, employ, or hire as an employee or independent contractor in competition with SpringBoard in the Southern California Territory any Contract Worker or healthcare professional whose identity Apex or Mission learned through its engagement with Springboard.

If Apex and/or Mission violates this paragraph, then Apex and/or Mission agrees to immediately pay to SpringBoard a fee in the amount of 100% of the Contract Worker's annualized compensation from SpringBoard, or $35,000, whichever figure is higher. The parties agree that this amount is for liquidated damages incurred by SpringBoard, and is not a penalty.

14. **Equal Employment Opportunity**
Apex and Mission provide or causes to provide employment, training, compensation, promotion, and other conditions of employment without regard to race, color, religion, national origin, sex, marital or veteran status, age, or disability.

15. **Drug Testing and Background Check**
Harmon and Giron agree to submit to drug testing and a background check prior to performing any services under this Agreement. SpringBoard reserves the right to terminate this Agreement if any party does not pass the drug test or if any party has a criminal history that raises doubts about ability to perform services under this Agreement. SpringBoard will provide copies of such test results if an adverse action will be taken to provide Harmon or Giron with an opportunity to contest the results.

16. **No Waiver of Terms**
The failure of any party to enforce at any time, or from time to time, any provision of this Agreement will not be construed as a waiver of any of the terms or conditions of this Agreement.

17. **Amendment and Assignment**
This Agreement may only be amended by another signed, written agreement between the parties that expressly amends, terminates, or supersedes this Agreement. Any party may assign this Agreement if the other party agrees in writing, and such agreement will not be unreasonably withheld.

a. If Mission/Joe Giron shall die, or become disabled from performing his functions as such for a period of time such that the viability of the business is endangered to the reasonable opinion of SpringBoard. SpringBoard and Apex agree that any commissions payable to Mission/Joe Giron shall continue for the period of this agreement.

18. **Validity of Terms**
If any term or provision of this Agreement is held by a court of competent jurisdiction to be void, illegal, unenforceable, or in conflict with any law of a federal, state, or local government having jurisdiction over this Agreement, the validity of the remaining

portions or provisions of this Agreement will remain in effect.

19. **Entire Agreement**
This Agreement constitutes the entire agreement between Apex, Mission and SpringBoard, and no other understanding that modifies the terms hereof will be binding unless made in writing and signed by authorized representatives of Springboard and Apex and/or Mission.

20. **Construction, Jurisdiction and Venue**
This Agreement will be construed and governed by the laws of the State of Arizona. The parties agree that the state and federal courts in Maricopa County, Arizona have exclusive jurisdiction and are the sole venue for any litigation between the parties arising out of or relating to this Agreement. Before any litigation, the parties agree to first mediate all disputes within forty-five days of either party requesting mediation, in Phoenix, Arizona, before a private mediator selected by the parties or, if they cannot agree on a mediator, then the mediator will be selected by the Presiding Judge of the Maricopa County, Arizona Superior Court. The parties will equally share the mediator's fees. The prevailing party in any litigation between the parties will be entitled to recover its court costs, all mediation expenses, and reasonable attorneys' fees from the other party.

21. **Notice**
Whenever notice is required under this Agreement, the notice will be given in writing and will be hand-delivered, e-mailed, or mailed, certified mail, return receipt requested, as follows:

To Apex:        Tom Harmon
                171 Pier Ave #297
                Santa Monica, CA 90405

To Mission:     Joe Giron
                5267 Renkin Lane
                Chino Hills CA 91709

To SpringBoard: Gavin Hays
                6970 E. Chauncey Lane, Ste 110
                Phoenix, Arizona 85054
                gavin.hays@springboardstaffing.com

22. **Anticipated Future Employment.**
SpringBoard anticipates that if Apex and/or Mission meet the revenue goal of $3.5 million over the fifteen months following execution of this Agreement, that Harmon and/or Giron will be offered employment directly with SpringBoard as salaried W-2 employees. At SpringBoard's discretion it is anticipated that, based on Harmon's and/or Giron's performance in meeting mutually agreed upon goals, Harmon and/or Giron, or

Apex and/or Mission, will be offered additional stock option grants in SpringBoard. Such additional grants will be documented through separate agreements.

IN WITNESS WHEREOF, the parties hereto have made and executed this Agreement in Phoenix, Arizona effective as of the day and year first above written.

APEX MEDICAL STAFFING, LLC, a
CALIFORNIA limited liability company

_____
Tom Harmon

Presicurb
_____
Title

5/27/14
_____
Date

MISSION MEDICAL SERVICES, INC.,
a CALIFORNIA corporation

_____
Joe Giron

PRESIDENT
_____
Title

5/27/14
_____
Date

SPRINGBOARD STAFFING, INC.,
an Arizona corporation

_____
Gavin Hays

_____
Title

5-27-14
_____
Date

8

# EXHIBIT 2

Tom Harmon/Apex
Joe Giron/Mission

April 25, 2014

Joe/Tom:

I am pleased to present you with the following proposal outline for the purposes of creating a mutually beneficial relationship with APEX/MISSION & WestWays. Please don't mistake the brevity of this format for a lack of interest. In addition to the advantages of becoming part of the SpringBoard team and aligning yourself with a niche focused firm; SpringBoard has engaged and focused management committed to building a firm with a national presence.

Among the several significant advantages to combining our business interests with Springboard are:

> We are a financially stable company with an outstanding track record nationally in cardiac services.
> A strong, transparent culture and management with a vision that breeds success.
> Technology and operational systems that enable us to scale.

Based on business needs and objectives SpringBoard believes a phased approach will be the most expeditious In meeting shared goals.

*PHASE I*

- Integrate California business through either the purchase of WestWays interest, or separate integration, under full separate P&L.
- Full P&L transparency, all expenses allocated (corporate overhead, insurances, commission to SBI team, etc.)
- Net Income Split as follows. 75% Apex/Mission, SBI 25%.
- Payments reconciled and made to your entities quarterly until such time as we agree on step 2.
- Client and talent facing branding to be under SpringBoard.
- Non-Solicitations executed.
- Stock Options = up to 5% each undiluted shares of SBI vested after 15 months providing 3.5M REV achieved within 15months.
- Background and Drug Testing on each stakeholder prior to execution.
- Either party may cancel with 60 days written notice.
- Advance rate: 10% of previous months billing total allocated according as instructed, deducted at quarterly reconciliation.

*PHASE II*

- Transition to Salaried W-2 employees.
- After Phase 1 (15months), upon mutual agreement.
- Additional option grant for up to a total 10% holding each combined Phase I&II.
- Options grant award based on achieving mutually agreed upon performance targets.

I look forward to your comments and would like to discuss the enclosed this week.

Sincerely,

*Gavin Hays*

Gavin Hays
SpringBoard, Inc.
Gavin.hays@springboardstaffing.com
866.465.6286

**Inc. 500**

6970 E. Chauncey Lane, #110 • Phoenix, AZ 85054•Phone 866-465-6286•Fax 877-890-5343

CONFIDENTIAL

# EXHIBIT 3



Tom Harmon                                                                                    1/14/16
6895 E. Camelback Rd. #2032
Scottsdale, AZ 85251

SpringBoard, Inc. ("SpringBoard") is pleased to offer you a full-time position
with our company. Your initial title will be Sr. Operations Director, and we anticipate
that your initial responsibilities will include, but are not limited to, the following:

- Provide mentoring, support and back up service to the Southern California Market
  that includes but is not limited to; providing direction to the assigned area
  representative, resolving customer and candidate issues.
- Work with CEO to identify operational improvement opportunities to improve
  efficiency across all lines of business. Work with operations, sales and accounting
  to execute on implementation. Perform Annual tasks including but not limited to;
  1099, year-end coordination with tax firm.
- Work with CEO to lead the building and development of SpringBoard's
  Education and Training division, working closely to develop products, recruit
  educators and trainers and necessary team members to grow the business
  profitably.
- HAVE FUN, BE YOURSELF

Your start date is Monday, January 18, 2016, 8:00 am. You will report to Gavin
Hays. Of course, we strive to continuously evaluate our business and your capabilities,
and your responsibilities and reporting relationship may change over time at the sole
discretion of SpringBoard.

Your starting salary is $190,000, which is subject to periodic review and
adjustment, before applicable withholding and taxes, paid on the company's regular
paydays. In addition, you will paid $350.00 per pay period ($9,100 annually) as an auto
allowance. You will also receive stock option awards at the discretion of the CEO based
on prior and future performance, in SpringBoard, and potential new entity to be
established. Finally, you are eligible for a bonus of up to 50% of your base salary based
on the profitability of SpringBoard, and our Education and Training division.

If you accept this offer of employment, you represent to SpringBoard that
employment with SpringBoard will not violate any contractual obligation or other duty
that you may owe to former employers or other parties, including obligations not to
compete and obligations not to disclose trade secrets or other confidential business
information.

If you accept this offer, both you and SpringBoard will have the right to terminate
your employment at any time, for no reason or for any reason, with or without cause.
This is known as employment "at will." Nothing in this letter or in any company policy
or statement, including statements made to you during negotiations about working at
SpringBoard, is intended to or does create terms of an express or implied contract of
employment, nor guarantees employment for a specific term. Only the Chief Executive
Officer and Board of Directors of SpringBoard may modify your at-will employment
status or guarantee that you will be employed for a specific period of time, and any such
modification must be in writing, approved by the Board of Directors, and signed by an
authorized SpringBoard representative. This letter, once executed by you and

your employment, and this agreement may be modified only in a written document approved by the SpringBoard Board of Directors and signed by you and an authorized SpringBoard representative.

To accept this offer, please carefully read the statement below, sign where indicated, and return the letter to me. Please let me know if you have any questions about the matters discussed in this letter, or otherwise. We sincerely hope that you will accept this offer and we look forward to working with you. The employment offer reflected in this letter expires 1/15/16 unless accepted by you or revoked by SpringBoard prior to that time.

Sincerely,

Gavin Hays

Gavin Hays

I understand, acknowledge, and agree to the terms and conditions of employment described in this letter, and I accept employment with SpringBoard on these terms and conditions.

_____          _____
[EMPLOYEE SIGNATURE]                                  Date

Print Name:_____

# EXHIBIT 4



October 28, 2016

Tom Harmon
7333 E. Desert Vista Rd
Scottsdale, AZ 85255

Dear Tom:

I am happy to advise you that you have been selected by the Board of Directors (the "**Board**") administering the 2009 Stock Incentive Plan (the "**Plan**") of SpringBoard, Inc. (the "**Company**"), to receive non-qualified stock options and that on October 12, 2016 (your "**Grant Date**") you were granted options to purchase Nine Thousand (9000) shares of the Company's Series B Common Stock (no par value) which stock is non-voting (the "**Stock**"), at a price of six dollars and 780017/100 ($6.780017) per share. The option granted to you is subject to the terms and conditions of the Plan and those additional terms and conditions are set forth in this Award Agreement (the "**Agreement**"). The terms of the Plan are incorporated by reference in this Agreement and govern the granting, holding and exercise of your option as though set forth in full in this letter. A copy of the Plan is attached as Exhibit A for your review. All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned thereto in the Plan.

The Board has imposed the following additional terms and conditions relating to your option and its exercise:

1.    You may exercise your option, only in accordance with Paragraph 3 below, by delivery to the Company (in care of its Secretary) at the principal offices of the Company, presently located at 6910 East Chauncey Ln, #120, Phoenix, Arizona 85054, written, irrevocable notice of exercise in the form attached to this letter as Exhibit B, specifying the number of shares with respect to which the option is being exercised, together with payment of the exercise price for those shares in cash or by check. Any other form of exercise or tender may be refused by the Company, acting through the Board or otherwise, in its discretion.

2.    Except as provided in the Plan, your option is not transferable other than by Will and is exercisable, during your lifetime, only by you. You may not assign or otherwise transfer or encumber your option or any interest in your option to any person in any way.

3.    (a) Providing you are complying with the provisions of your NON-SOLICITATION, NONDISCLOSURE AND INVENTION OWNERSHIP AGREEMENT dated January 11, 2016 (Non-solicit"), and subject to the further provisions of this Paragraph 3 and the Plan, your option shall first vest and become exercisable with respect to the shares subject to your option on the dates set forth below (the "Vesting Dates"), and not before, with respect to the designated number of shares as follows:

1800 shares will vest on October 12, 2017, which is the first anniversary of your Grant Date. Thereafter, your option will vest on each succeeding anniversary of that date, for the next four (4) years, at a rate of 1800 shares per year.

Notwithstanding any other provision of this Agreement (other than Paragraph 3(f) below), your option, to the extent not previously exercise, shall automatically terminate **and be of no further force or effect on and as of 5:00 o'clock p.m., M.S.T., of the date** which is the tenth (10th) anniversary of your Grant Date, unless terminated earlier as provided in the Plan.

(b)    In the event of your death prior to any Vesting Date, your unexpired option shall automatically terminate to the extent it has not vested pursuant to Paragraph 3(a) above or Paragraph 3(f) below, and your rights with respect to the option to the extent it has vested shall be governed by the Plan and Paragraphs 3(c) and 3(g) below.

(c)    In the event you violate your NON-SOLICITATION, NONDISCLOSURE AND INVENTION OWNERSHIP AGREEMENT dated January 11, 2016, the Company shall have the right (but not the obligation) to purchase any shares of Stock held by you (including shares acquired pursuant to Section 6.3 of the Plan). Through your signature below, you expressly acknowledge that this provision includes any Stock held in the Company, regardless of whether that Stock was acquired through the Plan or otherwise. The purchase price for your Stock shall be the lower of the exercise price you paid for that Stock or the Fair Market Value per share of the Stock as of the Termination Date, as defined in the Plan.

(i)    The Company (or its nominee) shall exercise this right to repurchase the shares of Stock, if at all, within six (6) months following the date of notice of your violation of your Independent Contractor Agreement by delivering written notice of exercise to you or your personal representative. From and after the delivery of the written notice of exercise by the Company, you will no longer be a shareholder of the Company for any purposes. Payment will be made in accordance with Paragraph (ii) below.

(ii)    Payment of the exercise price by the Company shall be made by an initial payment on the Initial Payment Date (defined below) equal to 20% of the purchase price, and the balance shall be made in four (4) equal annual installments of principal and accrued interest commencing on the first anniversary of the Initial Payment Date. Interest shall commence to accrue from the date of the exercise notice at the prime rate of interest in effect on the Initial Payment Date as announced in the Wall Street Journal (or a reasonable substitute selected by the Board), and it shall be adjusted annually thereafter to

2

the then-existing Wall Street Journal-announced prime rate (or a reasonable substitute selected by the Board), which adjusted rate of interest shall remain in effect for the entire year then beginning (interim changes in the prime rate during the year being disregarded). The "Initial Payment Date" for purposes of this Paragraph shall be the sixtieth (60th) day following delivery of the Company's notice of exercise. The Company may, at its election, prepay amounts due under this Paragraph, without premium or penalty. You will surrender all stock certificates to the Company promptly upon request.

(d)     In the event any shares of Stock acquired pursuant to exercise of options hereunder, or any interest therein, are to be transferred, voluntarily or involuntarily (including, without limitation, any sale, encumbrance, foreclosure or transfer in lieu thereof, or by operation of law, any division of marital property on account of divorce or legal separation being deemed a "transfer" for purposes hereof, but excluding transfers to which Paragraph 3(c) hereof applies), the Company (or its nominee) shall have a right of first refusal as follows:

(i)     You (or the holder of such shares if not you) shall give the Company advance written notice detailing all the terms of the proposed transfer. The Company (or its nominee) shall have the right (but not the obligation), exercisable upon delivery to the transferring shareholder of written notice of acceptance within thirty (30) days following receipt of the notice of proposed transfer described in the preceding sentence, to repurchase all or any of those shares on the terms and conditions set forth in the notice;

provided that the per share purchase price shall be the lesser of (X) the price or (Y) the Fair Market Value of the shares (and shall be the Fair Market Value in the event of a transfer not involving any consideration); and

provided further that the purchase price shall be payable, at the election of the Company (or its nominee), either on the terms set forth in the transferor's notice or in installments with interest as set forth in Paragraph 3(c)(ii). The Company may, at its election, prepay amounts due under this Paragraph, without premium or penalty.

(ii)     The date of consummating the purchase shall be the sixtieth (60th) day following delivery of the Company's (or its nominee's) notice of exercise. Failure by the Company (or its nominee) (without default by the transferring shareholder) to close the purchase within the above 60-day period shall give the transferring shareholder the right to transfer the shares or interest therein on the terms and to the person described in the notice during the 60 days following

3
6910 E. Chauncey Lane, #120, Phoenix, AZ 85054
623.516.8001

expiration of the original 60-day period; provided that the shares or interest therein to be transferred shall for all purposes remain subject to this Agreement. If the transferring shareholder fails to close the proposed transfer on those terms within that second 60-day period, the proposed transfer shall again be subject to the terms of this Paragraph 3(d). Notwithstanding the foregoing, the shares may be transferred or retransferred without invoking this right of first refusal between you and trusts of which you and/or your spouse are the sole beneficiaries by giving prior written notice certifying that such a transfer is to be made; provided that following that transfer, those shares shall remain subject to this right of first refusal and all the other provisions of this Agreement.

(e) Until the Company affirmatively elects to no longer be treated as an S corporation under Subchapter S of the Code, to the extent the effect of any transfer of any shares of Stock or interest therein would be to disqualify the Corporation from treatment as an S corporation under the requirements of Subchapter S of the Code, as from time to time amended (including without limitation those requirements contained in current Section 1361 of the Code), that provision or action shall be void and of no effect. **So long as the Company's right to repurchase the Stock as set forth in this Paragraph 3** remains effective, neither you, nor your personal representative(s), devisee(s), heir(s), successor(s), or assignee(s) shall sell, assign or otherwise transfer any shares of Stock or interest therein without obtaining the written agreement of the purchaser, assignee or transferee that the shares remain subject to this repurchase right, and you agree that certificates evidencing the Stock may be legended to reflect the foregoing restrictions.

(f) In its sole discretion, the Board may waive or accelerate vesting of options, or waive or extend expiration dates.

(g) If at any time within 2 years after your Grant Date you engage in any activity which is prohibited by any agreement executed by you in connection with your engagement to provide services with the Company, including without limitation any non-disclosure and restrictive covenant agreements between you and the Company, then,

(i) this option shall terminate effective the date on which you enter into that activity, unless terminated sooner by operation of another term or condition of this Agreement, and

(ii) any option gain realized by you from exercising all or a portion of this option shall be immediately payable by you to the Company on the date on which you entered into that activity.

The Company shall have the right to set off any amount owed to you by the Company against any amounts you owe to the Company under this Paragraph 3(g).

(h)     Paragraph 3(d) shall terminate and be of no further force and effect **automatically upon the closing of an initial public stock offering of the Company's** common stock under the Securities Act the result of which is that the **Company's** common stock is traded, or quoted, as applicable, on a national securities exchange, over the counter on NASDAQ, or through the National Market System.

4.     The Company will reserve or keep available at all times sufficient shares of its common stock to permit the exercise of your option and all other options granted or to be granted under the Plan.

5.     It is contemplated that the common stock in the Company to be issued to you upon exercise of your option will not be registered under the Securities Act of 1933, **as amended (the "Act") or any applicable state securities laws, in reliance on** exemptions from registration thereunder. If in the opinion of counsel satisfactory to the Company no exemption from registration is then available, of if the issuance is otherwise in violation of applicable law at the time purchase rights are exercised under **this option, then the Company's obligation to issue shares of its common stock upon** exercise of your option shall be suspended until the **time as the Company's couns**el determines that an exemption from registration is available and the shares can be issued without violation of law. If an exemption is available in the opinion of that counsel, and the issuance is not otherwise in violation of applicable law, you (or your personal representative(s), devisee(s), or heir(s)) will deliver to the Company as a condition precedent to giving notice of each exercise, an investment letter agreement in form and substance satisfactory to the Company to enable the Company to comply with the Act or other applicable securities laws and which may, among other things, limit or condition the right to dispose of shares acquired under your option. Dispositions of the shares of Stock acquired by exercise of your option will be permitted only if in the opinion of counsel satisfactory to the Company that disposition is not in violation of this Agreement, the Act, any applicable state securities laws, or any other applicable law, and you (or your personal representative(s), devisee(s), or heirs(s)) deliver to the Company a letter agreement in form and substance satisfactory to the Company whereby your successor(s) or assign(s) agrees to be bound by the terms and conditions of this Agreement. You (and your personal representative(s), devisee(s), or heir(s)) agree to pay all costs of obtaining any legal opinions and all costs in connection with proposed exercise of your option or dispositions of shares acquired pursuant to your option.

6.     You agree to pay to the Company or to make arrangements satisfactory to the Board to pay to the Company, at the time as any income is recognized by you with respect to this option, any Federal, state, or local taxes of any kind required by law to be withheld on that income by the Company. In the event of a disposition or other transfer

5
6910 E. Chauncey Lane, #120, Phoenix, AZ 85054
623.516.8001

by you of common stock issued to you upon exercise of your options, you agree to provide the Company promptly written notice describing in reasonable detail the disposition or transfer, including without limitation the sale price, if any, and date of transfer or dispositions.

7.    The Board may effect certain amendments to the Plan (within the limitations prescribed by the Plan) and the Board has the ultimate and conclusive authority to interpret and administer the Plan and options (including this option) granted under it.

8.    The Plan and this option granted to you thereunder are governed by, and shall be interpreted according to, the laws of the State of Arizona without giving effect to the principles of conflicts of laws.

9.    Each party hereto agrees to do all such things and take all actions, and to make, execute and deliver other documents and instruments, as shall be reasonably requested to carry out the provisions, intent and purpose of this Agreement.

**10.    Because the tax, financial, legal and accounting effects may vary depending on your personal circumstances, and the laws may change from time to time, it is strongly recommended that you consult with tax, legal, financial, accounting and other advisors to determine the impacts on you associated with this option.**

**This Agreement only grants the options described above and is not any promise to issue future Awards to you under the Plan. Neither does it constitute an employment agreement or a promise or assurance of employment for any period of time, including any period of time necessary to permit full vesting or exercise of the options under Paragraph 1 above.**

**You acknowledge and agree that the Company has affirmatively elected to be treated as an S corporation under Subchapter S of the Code. Upon exercise of your option you will hold shares of non-voting Series B Common Stock, and will be allocated on a pro rata daily basis your share of the Company's income and loss items. This may result in additional income tax liability to you, and the Company is under no obligation to make distributions to you that would offset any tax liability and that taxes will be due regardless of whether you receive any cash distributions on that income from the Company. The decision on whether to make distributions, and the amount of those distributions (which will be shared on a pro rata basis amongst all stockholders), will be made by the Board of Directors or the holders of a majority of the Company's outstanding voting stock.**

Please acknowledge your receipt of this Agreement, together with the materials referred to herein, and your agreement to the terms and conditions of your option as set forth herein and in the Plan, by signing the enclosed copy of this letter and returning it promptly to the Secretary of the Company at the address set forth in Section 1 of this letter. Any questions concerning any matter relating to your stock option or the Plan should also be addressed to the Secretary.

Very truly yours,

SPRINGBOARD, INC.

By_____

Name: Gavin Hays          _____

Title: _CEO_____

The undersigned, as spouse of the grantee hereby confirms that community property of grantee and the undersigned is subject to and bound by the agreement set forth above:

ACCEPTED AND AGREED:

_____
Print Name:_____

_____

Tom Harmon

SpringBoard
HEALTHCARE

EXHIBIT A

[Attach Plan]

## SpringBoard

### EXHIBIT B

### NOTICE OF EXERCISE OF OPTION TO PURCHASE SHARES OF SPRINGBOARD, INC. AND RECORD OF STOCK TRANSFER

.    I hereby exercise my Non-Qualified Stock Option granted by SpringBoard, Inc. under its 2009 Stock Incentive Plan (the "Plan") subject to all the terms and provisions referred to in the Plan, and notify you of my desire to purchase _____ shares of Common Stock of SpringBoard, Inc. (the "Company") which were offered to me pursuant to that Option. Enclosed is my check in the sum of $_____ in full payment of those shares. I also agree to provide a check for the taxes due on that award, or to otherwise make arrangements satisfactory to the Company for the payment of those taxes promptly following notification to me of the taxes due upon this exercise.

I hereby represent that the _____ shares of the Company's Common Stock to be delivered to me pursuant to the above-mentioned exercise of the Option granted to me on _____ are being acquired by me as an investment and not with a view to, or for sale in connection with, the distribution of any such shares. I also represent that I have read and fully understand the Plan and the Agreement, including without limitation the restrictions on transfer of the shares hereby being acquired and the Company's repurchase rights with respect to those shares. Through my signature below, I expressly acknowledge that this Agreements permits the Company to repurchase any Stock I hold in the Company, regardless of whether those shares were acquired through the Plan or otherwise. I agree to indemnify the Company and its subsidiaries, together with their respective officers and directors, against any and all liabilities, losses, damages and expenses (including reasonable attorney fees) arising from or in connection with any disposition of the shares hereby being acquired, or any interest therein, in violation of applicable securities laws or regulations.

I acknowledge and agree that (a) the Company has affirmatively elected to be treated as an S corporation under Subchapter S of the Code, (b) upon exercise of this Option I will hold shares of non-voting Series B Common Stock, and will be allocated on a pro rata daily basis my share of the Company's income and loss items, which may result in additional income tax liability, (c) the Company is under no obligation to make distributions to me that would offset any tax liability and that taxes will be owed by me regardless of whether I receive any cash distributions, and (d) the decision on whether to make distributions, and the amount of such distributions (which will be shared on a pro rata basis amongst all stockholders), will be made by the Board of Directors or the holders of a majority of the Company's outstanding voting stock.

Dated: _____.

_____

# EXHIBIT 5

SpringBoard
HEALTHCARE

6910 E. Chauncey Lane, #120
Phoenix, AZ 85054
www.springboardhealthcare.com

## SPRINGBOARD, INC.
## INCENTIVE STOCK OPTION AWARD AGREEMENT

Thomas M. Harmon
7333 E. Desert Vista Rd.
Scottsdale, AZ 85255

Dear Mr. Harmon:

I am happy to advise you that you have been selected by the Board of Directors (the "Board") administering the 2017 Equity Incentive Plan (the "Plan") of Springboard, Inc., an Arizona corporation (the "Company"), to receive an incentive stock option and that on August 18, 2017 (your "Grant Date"), you were granted an option to purchase eighty thousand (80,000) shares of the Company's Series B Common Stock (no par value) (the "Stock") at a price of Two Dollars and 08/100 ($2.08) per share (the "Option"), which the Board has determined to be the Fair Market Value of the Stock on the Grant Date. The option granted to you is subject to the terms and conditions of the Plan and such additional terms and conditions as are set forth in this Award Agreement (collectively the "Agreement"). The terms of the Plan are incorporated by reference in this Award Agreement and govern the granting, holding, and exercise of your option as though set forth in full in this letter. A copy of the Plan is attached as Exhibit A for your review. All capitalized terms used in this Award Agreement and not otherwise defined herein shall have the meanings expressly assigned thereto in the Plan.

The Board has imposed the following additional terms and conditions relating to your option and its exercise:

1.      Exercise. You may exercise your option, only in accordance with Paragraph 3 below, by delivery to the Company (in care of its Secretary) at the principal offices of the Company, presently located at 6910 Chauncey Lane, Ste 120, Phoenix, AZ 85054, written, irrevocable notice of exercise in the form attached to this letter as Exhibit B, specifying the number of shares of Stock with respect to which the option is being exercised, together with payment of the exercise price for those shares of Stock in cash or by check. Any other form of exercise or tender may be accepted or refused by the Company, acting through the Committee or otherwise, in its discretion.

2.      Not Transferable. Your option is not transferable other than by will or the laws of descent and distribution and is exercisable, during your lifetime, only by you. You may not assign or otherwise transfer or encumber your option or any interest in your option to any person in any way.

3.      Restrictions on Exercise and Sale.

(a)      Vesting. The Option is fully vested as of the Grant Date.

(b)      Termination. You may not exercise this option after termination of your relationship with the Company for any reason.

(c)     Acceleration of Vesting.  Reserved.

4.     Reservation of Shares.  The Company will reserve or keep available at all times sufficient shares of its Stock to permit the exercise of your option and all other options granted or to be granted under the Plan.

5.     Securities Law Matters.  It is contemplated that the Stock to be issued to you upon exercise of your option will not be registered under the Securities Act or any applicable state securities laws, in reliance on exemptions from registration thereunder.  If in the opinion of counsel satisfactory to the Company no exemption from registration is then available, or if such issuance is otherwise in violation of applicable law at the time purchase rights are exercised under this option, then the Company's obligation to issue shares of its Stock upon exercise of your option shall be suspended until such time as the Company's counsel determines that an exemption from registration is available and such shares of Stock can be issued without violation of law.  If such an exemption is available in the opinion of such counsel, and such issuance is not otherwise in violation of applicable law you (or your personal representative(s), devisee(s), or heir(s)) will deliver to the Company as a condition precedent to giving notice of each exercise, an investment letter agreement in form and substance satisfactory to the Company to enable the Company to comply with the Securities Act or other applicable securities laws and that may, among other things, limit or condition the right to dispose of shares of Stock acquired under your option.  Dispositions of the shares of Stock acquired by exercise of your option will be permitted only if in the opinion of counsel satisfactory to the Company such disposition is not in violation of the Securities Act, any applicable state securities laws, or any other applicable law, regulation, or rule, and you (or your personal representative(s), devisee(s), or heir(s)) deliver to the Company a letter agreement in form and substance satisfactory to the Company whereby your successor(s) or assign(s) agrees to be bound by the terms and conditions of Paragraph 3 above and this Paragraph 5.  You (and your personal representative(s), devisee(s), or heir(s)) agree to pay all costs of obtaining any legal opinions and all costs in connection with proposed exercise of your option or dispositions of shares of Stock acquired pursuant to your option.

6.     Claw-back.  If it comes to the attention of the Committee that you are consuming alcohol, whether at work or outside of work, you will sell and the Company will repurchase any Shares issued to you upon the exercise of your Option for a purchase price of $1.00.

7.     Withholding.  You agree to pay to the Company or to make arrangements satisfactory to the Committee to pay to the Company, at such time as any income is recognized by you with respect to this option, any Federal, state, or local taxes of any kind required by law to be withheld on such income by the Company.  In the event of a disposition or other transfer by you of Stock issued to you upon exercise of your options, you agree to provide to the Company promptly written notice describing in reasonable detail the disposition or transfer, including without limitation the sale price, if any, and date of transfer or disposition.

8.     Amendments to Plan.  The Committee may effect certain amendments to the Plan (within the limitations prescribed by the Plan) and the Committee has the ultimate and conclusive authority to interpret and administer the Plan and options (including this option) granted under it.

9.      Governing Law. The Plan and this option granted to you thereunder are governed by, and shall be interpreted according to, the laws of the State of Arizona without giving effect to the principles of conflicts of laws.

10.     Further Assurances. Each party hereto agrees to do all such things and take all such actions, and to make, execute and deliver such other documents and instruments, as shall be reasonably requested to carry out the provisions, intent and purpose of this Agreement.

11.     Tax Matters. Section 422 of the Internal Revenue Code of 1986, as amended, provides for advantageous tax treatment upon the disposition of shares acquired pursuant to an incentive stock option such as you have been granted herein. However, in general, in order to qualify presently for such advantageous treatment, you must make no disposition of shares of Stock acquired by you pursuant to this option within two (2) years from your Grant Date nor within one (1) year after the shares of the Stock are issued to you upon exercise of your option. Although the foregoing holding period requirements do not represent a term or condition of the option, you may find that it is in your best interests to comply with them. **Because this paragraph is only a summary of complex tax law requirements, the tax effect may vary depending on your personal circumstances, and the tax laws may change from time to time, it is strongly recommended that prior to receipt of and exercise of this option you consult with tax counsel or a tax advisor concerning this option and current tax treatment.**

12.     Notice. Any notice, request, or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or on the third business day following deposit in the U.S. mail by registered or certified mail, return receipt requested, postage prepaid to the party's last known address. Any party may by notice so given change its address for future notices hereunder.

13.     Not an Employment Agreement. **This Award Agreement is not an employment agreement or assurance of continued employment for any period of time, including any period of time necessary to permit vesting of your options under Paragraph 3(a) above.**

Please acknowledge your receipt of this Award Agreement, together with the materials referred to herein and your agreement to the terms and conditions of your option as set forth herein and in the Plan by signing the enclosed copy of this letter and returning it promptly to the Secretary of the Company at the address set forth in Section 1 of this letter. Any questions concerning any matter relating to your incentive stock option or the Plan should also be addressed to the Secretary.

Very truly yours,

Springboard, Inc.

Gavin Hays, CEO

ACCEPTED AND AGREED:

_____

Employee's Signature

Tom Harman

Print Name

The undersigned, as spouse of the grantee identified above, hereby confirms that the community property of Employee and the undersigned is subject to and bound by the agreement set forth above.

_____

Signature of Employee's Spouse

Alyson M. Harmon

Print Name

ORIGINAL

MICHAEL K. JEANES, CLERK

RECEIVED
NIGHT DEPOSITORY

17 NOV 16  PM 12: 18

FILED BY A. PLASCENCIA

1   Christopher M. Goodman
2   LAW OFFICE OF CHRISTOPHER GOODMAN PLC
    45 W. Jefferson St., Suite 512
3   Phoenix, AZ 85003
    (602) 253-1000
4   chris@goodmanlegal.com
5   *Attorney for Plaintiffs Apex Medical Staffing LLC and*
    *Thomas Harmon*
6

7

8         **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9            **IN AND FOR THE COUNTY OF MARICOPA**

10

11  THOMAS HARMON, an individual; and        NO.
    APEX MEDICAL STAFFING LLC, a                   CV 2017-014286
12  California limited liability company,

13                 Plaintiffs,                    **SUMMONS**

14         vs.

15  GAVIN HAYS and JANE DOE HAYS,           If you would like legal advice from a lawyer,
    a married couple; SPRINGBOARD,            Contact the Lawyer Referral Service at
16  INC., an Arizona corporation; and                602-257-4434
    various unknown and/or fictional                     or
17  individuals and entities,                     www.maricopalawyers.org
                                                   Sponsored by the
18                 Defendants.                   Maricopa County Bar Association

19

20

21  **THE STATE OF ARIZONA TO:**

22      Springboard, Inc.
23      c/o Statutory Agent Gavin Hays
        6910 E Chauncey Lane
24      Suite 120
25      Phoenix, Arizona 85054

26  YOU ARE HEREBY SUMMONED and required to appear and defend in the above-entitled

27  action in the above-entitled Court within 20 days, exclusive of the date of service, after service

28  of this Summons upon you if served within the State of Arizona; or within 30 days, exclusive

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1   if the date of service, if served without the State of Arizona, and you are hereby notified that

2   in case you fail to so do, judgment by default may be entered against you for the relief

    demanded in the Complaint.

3

4   Requests for reasonable accommodation for persons with disabilities must be made to the

5   division assigned to the case by the party needing accommodation or his/her counsel at least

    three (3) judicial days in advance of a scheduled proceeding. Requests for an interpreter for

6   persons with limited English proficiency must be made to the division assigned to the case by

7   the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial

    days in advance of a scheduled court proceeding.

8

9   The names and address of Plaintiff's attorneys are:

10

11              Christopher M. Goodman (#023231)
                LAW OFFICE OF CHRISTOPHER GOODMAN PLC

12              45 W. Jefferson Street

13              Suite 512
                Phoenix, Arizona 85003

14              (602) 253-1000

15              chris@goodmanlegal.com

16  GIVEN UNDER MY HAND and seal of the above-referenced Court of Arizona, Maricopa

17  County this _____ day of _ NOV 0 1 2017 2017.

18

19                          MICHAEL K. JEANES, CLERK
                            MARICOPA COUNTY SUPERIOR COURT

20

21

22                      By: _____

23                          Deputy Clerk

24
                                    V. Canleales
25                                  Deputy Clerk

26

27

28

                                    2

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

ORIGINAL

MICHAEL K. JEANES, CLERK

RECEIVED
NIGHT DEPOSITORY

17 NOV 16 PH 12: 18

FILED BY A. PLASCENCIA

1   Christopher M. Goodman
2   LAW OFFICE OF CHRISTOPHER GOODMAN PLC
    45 W. Jefferson St., Suite 512
3   Phoenix, AZ 85003
    (602) 253-1000
4   chris@goodmanlegal.com
5   *Attorney for Plaintiffs Apex Medical Staffing LLC and*
    *Thomas Harmon*
6

7

8          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9              **IN AND FOR THE COUNTY OF MARICOPA**

10

11  THOMAS HARMON, an individual; and      NO.   CV 2017-014286
    APEX MEDICAL STAFFING LLC, a
12  California limited liability company,

13                  Plaintiffs,               **SUMMONS**

14          vs.

15  GAVIN HAYS and JANE DOE HAYS,         If you would like legal advice from a lawyer,
    a married couple; SPRINGBOARD,          Contact the Lawyer Referral Service at
16  INC., an Arizona corporation; and              602-257-4434
    various unknown and/or fictional                   or
17  individuals and entities,                  www.maricopalawyers.org
                                                Sponsored by the
18                  Defendants.             Maricopa County Bar Association

19

20

21  **THE STATE OF ARIZONA TO:**

22
        Gavin Hays
23      6910 E Chauncey Lane, Suite 120
        Phoenix, Arizona 85054
24      (office)

25
        Or
26
        26750 N. 64ᵗʰ Street
27      Scottsdale, Arizona 85266
28      (home)

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

1
2
3
4
5

YOU ARE HEREBY SUMMONED and required to appear and defend in the above-entitled action in the above-entitled Court within 20 days, exclusive of the date of service, after service of this Summons upon you if served within the State of Arizona; or within 30 days, exclusive if the date of service, if served without the State of Arizona, and you are hereby notified that in case you fail to so do, judgment by default may be entered against you for the relief demanded in the Complaint.

6
7
8
9
10

Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled proceeding. Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

11
12

The names and address of Plaintiff's attorneys are:

13
14
15
16
17
18

> Christopher M. Goodman (#023231)
> LAW OFFICE OF CHRISTOPHER GOODMAN PLC
> 45 W. Jefferson Street
> Suite 512
> Phoenix, Arizona 85003
> (602) 253-1000
> chris@goodmanlegal.com

19
20

GIVEN UNDER MY HAND and seal of the above-referenced Court of Arizona, Maricopa County this _____ day of ___ NOV 0 1 2017 ___ 2017.

21
22
23
24
25
26
27
28

MICHAEL K. JEANES, CLERK
MARICOPA COUNTY SUPERIOR COURT



By: _____
Deputy Clerk

V. Canisales
Deputy Clerk

Law Office of Christopher Goodman PLC
45 W. Jefferson St., Suite 512
Phoenix, AZ 85003
(602) 253-1000

2



**Kiwi**

Process Service
Order No: 20174307
Client Ref: CV2017-014286

MICHAEL K. JEANES, CLERK

RECEIVED
NIGHT DEPOSITORY

**17 NOV 16 PM 12: 18**
**FILED BY A. PLASCENCIA**

IN THE MARICOPA COUNTY SUPERIOR COURT
FOR THE STATE OF ARIZONA

THOMAS HARMON, an individual; ET AL.,
        Plaintiff(s)/Petitioner,

CASE NO.: CV2017-014286

vs.

GAVIN HAYS and JANE DOE HAYS, a married couple ; ET AL.,
        Defendant(s)/Respondent.

**DECLARATION OF SERVICE**

Edward Pulley #Mc-5377, the undersigned, declares under the penalty of perjury: I am a licensed private process server in Maricopa County and I am fully qualified pursuant to A.R.S. Rule 4(e), governing Service of Process in the State of Arizona to serve process in this case. I received for service the following documents in this action:

- **SUMMONS; COMPLAINT; CERTIFICATE OF COMPULSORY ARBITRATION**

from **LAW OFFICE OF CHRISTOPHER GOODMAN PLC** located in Phoenix, Arizona on 11/1/2017 8:00. I personally served copies of the documents listed above on those named in the manner, date, and time listed below. All services except where noted were made in Scottsdale, Arizona.

ENTITY:              **GAVIN HAYS**

DATE & TIME:    11/6/2017 20:48
ADDRESS:          26750 NORTH 64TH STREET, SCOTTSDALE, AZ, 85266, the usual place of residence.
MANNER:           by serving Gavin Hays, a person authorized to accept service.
DESCRIPTION:
NOTES:

Date:  November 15, 2017

Edward Pulley #Mc-5377

| STATEMENT OF COSTS | |
|---|---|
| SERVICE | 16.00 |
| MILEAGE | 75.00 |
| RUSH FEES | 25.00 |
| ADDITIONAL MILEAGES | 60.00 |
| SKIP TRACE | |
| SPECIAL HANDELING | |
| STAKEOUT | |
| DOCUMENT PREPARATION | 10.00 |
| **TOTAL** | **$186.00** |


**Kiwi**

**Process Service**
**Order No: 20174308**
**Client Ref: CV2017-014286**

MICHAEL K. JEANES, CLERK

RECEIVED
NIGHT DEPOSITORY

17 NOV 16 PM 12: 18

FILED BY A. PLASCENCIA

IN THE MARICOPA COUNTY SUPERIOR COURT
FOR THE STATE OF ARIZONA

THOMAS HARMON, an individual; ET AL.,
    Plaintiff(s)/Petitioner,

vs.

CASE NO.: CV2017-014286

GAVIN HAYS and JANE DOE HAYS, a married couple ; ET AL.,
    Defendant(s)/Respondent.

**DECLARATION OF SERVICE**

Edward Pulley #Mc-5377, the undersigned, declares under the penalty of perjury: I am a licensed private process server in Maricopa County and I am fully qualified pursuant to A.R.S. Rule 4(e), governing Service of Process in the State of Arizona to serve process in this case. I received for service the following documents in this action:

- **SUMMONS; COMPLAINT; CERTIFICATE OF COMPULSORY ARBITRATION**

from **LAW OFFICE OF CHRISTOPHER GOODMAN PLC** located in Phoenix, Arizona on 11/1/2017 8:00. I personally served copies of the documents listed above on those named in the manner, date, and time listed below. All services except where noted were made in Scottsdale, Arizona.

**ENTITY:**          **SPRINGBOARD, INC C/O GAVIN HAYS, STATUTORY AGENT**

**DATE & TIME:**      11/6/2017 20:48
**ADDRESS:**          26750 NORTH 64TH STREET, SCOTTSDALE, AZ, 85266, the usual place of residence.
**MANNER:**           by serving Gavin Hays, Statutory Agent, a person authorized to accept service.
**DESCRIPTION:**
**NOTES:**

Date: November 15, 2017

Edward Pulley #Mc-5377

| STATEMENT OF COSTS | |
|---|---|
| SERVICE | 16.00 |
| MILEAGE | |
| RUSH FEES | |
| ADDITIONAL MILEAGES | |
| SKIP TRACE | |
| SPECIAL HANDELING | |
| STAKEOUT | |
| DOCUMENT PREPARATION | 10.00 |
| **TOTAL** | **$26.00** |